456 So.2d 698 (1984)
Merripennie McMurry STONG, Administratrix of the Estate of Kirk Harrison Stong, Deceased, Appellant,
v.
FREEMAN TRUCK LINE, INC. and Charles I. Long, Appellees.
No. 53936.
Supreme Court of Mississippi.
July 25, 1984.
As Modified on Denial of Rehearing September 26, 1984.
*701 Brad Sessums, Young, Scanlon & Sessums, Jackson, for appellant.
Jimmie B. Reynolds, Jr., Whitman B. Johnson, III, Steen, Reynolds, Dalehite & Currie, Jackson, for appellees.
Before PATTERSON, C.J., and BOWLING and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
This wrongful death action arises from a fatal motor vehicle accident occurring on Interstate Highway 55 in north Jackson in the early morning hours of July 4, 1980. On that occasion, Kirk Harrison Stong drove his automobile into an eighteen-wheeler stopped in the right-hand southbound lane of traffic and died. Trial resulted in a defense verdict. Appellant Administratrix' principal argument here is that she was entitled to a peremptory instruction on liability or, at least, on the negligence issue.
Identification of the standard of care by which to judge the Defendant trucker's conduct turns on whether the place where the accident occurred was within a "business district" within the meaning of state highway safety statutes and comparable federal regulations.
For the reasons explained below, we hold that the accident occurred outside a business district. As a matter of law a controlled-access, high-speed interstate highway is outside a business district, thus rendering applicable safety standards more stringent than might otherwise apply. The standards so identified become under our law the standard of conduct of a reasonable man. Violations constitute negligence per se.
At least five instructions submitted to the jury erroneously treat the business district issue as one of fact. Those instructions are so framed that the defense verdict could have been the product of the jury's decision that the accident happened within a business district, in which event the jury would never have reached the negligence per se issues. Because three of these instructions were given at the request of Plaintiff Administratrix, however, we cannot reverse on this point.
On this record all other issues were for the jury. We expressly reject Appellant Administratrix' claim that she was entitled to a peremptory instruction on liability. Likewise rejected is her argument that the jury should have been instructed peremptorily that Freeman/Long were negligent.
The boat she could have caught Administratrix has missed. Two jury instructions erroneously advise the jury that violation of the statutory standards was mere evidence of negligence, not negligence per se. These instructions were given at Administratrix' request after the Court had denied three negligence per se instructions. Thereafter, however, Administratrix requested and was granted two negligence per se instructions. Because she failed to withdraw the otherwise comparable mere-evidence-of-negligence instructions, Administratrix must be held responsible for any resulting confusion in the minds of the jurors. Again reversal is precluded.
We also consider here two assignments of error arising from the question whether Stong was intoxicated at the time of the accident. In the end, we affirm.
At least two of the points raised: (1) is an interstate highway ever in a business district and (2) are the results of a blood test for intoxication ever admissible in a civil action, are questions of first impression in this state. The interplay of federal highway safety regulations with our state statutes has likewise never been considered by this Court. Because these points are likely to arise in the future and are matters *702 with respect to which the bench, bar and litigants need, and are entitled to receive, our guidance, we discuss the issues with some care.

II.

A.
The scene of the fatal accident is the westernmost or right-hand lane for southbound traffic on Interstate Highway 55 as it traverses the northern environs of the City of Jackson. To further pinpoint the location, the Holiday Inn North abuts the frontage road (as distinguished from I-55 itself) to the southwest of the accident scene. On the date in question Holmes Volkswagen Company adjoined the frontage road to the northwest.[1]
Interstate Highway 55 in this and other areas is a part of the national interstate highway system. A significant feature of that system and this highway is that access to it is controlled or limited. Continuous, unobstructed traffic flow is its goal. Though the places of business abutting the frontage road are within a few hundred feet of the scene of the accident, access from I-55 can be had only by travelling to the nearest exit  that to the south being a mile away and to the north being 7/10ths of a mile.
Interstate Highway 55 is a four-lane divided highway, running generally in a north-south direction. Two lanes are provided for northbound traffic and two lanes are provided for southbound traffic, and it is the latter which are involved in the case at bar. The northbound and southbound lanes are divided by a grassy, depressed median area. The speed limit for the area in question is 50 miles per hour. There is no overhead lighting at night.
One driving through north Jackson on I-55 would observe numerous places of business on both the east and west sides. None of these places of business, however, abut or are contiguous to I-55 itself. Rather, they adjoin the frontage roads. On both the east and west sides of I-55 in the area in question there exists a two-lane frontage road. Each frontage road is separated from I-55 by another grassy depression and embankment. As indicated above, access from I-55 to the frontage road can be had only at the prescribed exits, none of which are in the immediate vicinity of the occurrence in question.
It all happened in the early morning hours of July 4, 1980, that is, somewhere between 1:45 and 2:00 A.M. An unlighted vehicle was stalled and apparently abandoned in the right (or west) lane of I-55 for southbound traffic. Lighting available in the area was sparse though how sparse was never made clear.
The scene being set, enter the players: Charles I. Long approached from the north driving an eighteen wheeler. Long's tractor and trailer were owned by Freeman Truck Line, Inc. Freeman is a Mississippi-based firm operating a motor transportation line for hire in interstate commerce. Long, employed by Freeman, was then engaged within the course and scope of his employment. Long was southbound from Memphis.
Minutes before arriving at the scene, Long received a radio communication from another trucker advising that a stalled, unlit vehicle occupied the right-hand lane for southbound traffic. As Long approached he observed the other truck, from which he had received the radio message, stopped on the shoulder of I-55 facing south but completely off of the main traveled portion of the highway. Long was in the right-hand lane  the one obstructed by the stalled vehicle.
Long slowed to a stop. He could not change lanes because there were faster southbound vehicles approaching in the left-hand lane from his rear. While stopped in the right-hand lane Long *703 learned from the driver of the other truck that another southbound vehicle had just had a near-collision with the stalled, unlighted vehicle. At this time Long's truck was situated squarely within the right-hand (or westernmost) lane of I-55 for southbound traffic. To the west was a shoulder of sufficient width and apparent strength to support Long's truck had he wished to move it there. Instead Long turned on the red emergency flashers on his truck and got out. On the rear of Long's truck in addition to the emergency flashers were red reflectors whose visibility became a matter of dispute at trial.
By this time a police officer had arrived on the scene. Long, the other trucker and the police officer made an effort to push the stalled car off the highway. They did not succeed. Long then agreed with the others that a more effective warning for approaching southbound traffic needed to be put into place. The police officer would drive his car to the rear of Long's truck and turn on his flashing blue light.
At the time Long had in his truck three red, triangular reflectors of regulation size and design which he could have placed on the road as warnings to approaching traffic. It seems probable that the flashing blue light of the patrol car would be more likely to attract the attention of southbound approaching vehicles than would the reflectors. From the time Long stopped his truck until Kirk Harrison Stong's fatal entry upon the stage, no more than ten minutes elapsed, arguably less. Witnesses estimated that between 50 and 100 southbound vehicles successfully navigated the area without untoward incident.
As the police officer, blue light already flashing, sped north on the west access road preparatory to getting out on to I-55 and pulling up behind Long's truck, Stong approached. Stong had been at a pre-Fourth of July party. He had been drinking but the extent to which this was so remains a matter of great controversy. Perhaps his attention was diverted by the flashing blue lights of the police car speeding north and going the wrong way on the frontage road. We will never know, for Stong plowed straight into the back of Long's truck and suffered fatal injuries. Several eye witnesses testified that Stong was driving between 50 and 60 miles per hour and that he never applied his brakes before impact. No skid marks were found afterwards.
Stong was pronounced dead of massive head wounds approximately two hours later. A blood alcohol test, the subject of great controversy here, found Stong's blood to contain .17 grams of ether alcohol per 100 ml. of blood. About this more will be said later.

B.
On September 30, 1980, Merripennie McMurry Stong, administratrix of the estate of Kirk Harrison Stong, deceased, filed this wrongful death action in the Circuit Court of the First Judicial District of Hinds County, Mississippi. Named as Defendants were Freeman Truck Line, Inc. and its employee/driver, Charles I. Long.
In due course the case was called for trial in Circuit Court which resulted in a jury verdict for both Defendants. On May 22, 1981, the Circuit Court entered final judgment in favor of Freeman and Long and against Stong's personal representative and administratrix, who now appeals to this Court.

III.

A. Introduction

The fundamental complaint of the Appellant Administratrix here is that the trial judge refused to instruct the jury that as a matter of law Freeman/Long were guilty of negligence. Her contention is based on two highway safety statutes of this state[2] and two comparable federal highway safety *704 regulations.[3] She argues that the uncontradicted evidence establishes that Freeman/Long violated these standards, in the context of which, the trial judge's refusal to instruct peremptorily on the negligence issue is said to have become reversible error.[4] In several particulars we agree.
First, in at least two substantive instructions, Nos. 11 and 13, the jury was advised that acts or omissions violative of applicable highway safety standards derived from state statute or federal regulation were merely evidence of negligence and not negligence per se. This was error.
Second, an outcome-determinative question in both this state's statutes and the federal regulations is whether the stretch of Interstate Highway 55 where the accident occurred was "outside of a business or residence district". See Miss. Code Ann. §§ 63-3-903(1) and 63-7-71(1) (1972) (outlines required standard of care in areas outside a business district); 49 C.F.R. § 392.21-22 (1983) (same). Under the uncontradicted facts of this case, the scene of the fatal accident was as a matter of law outside a business district (the area was also clearly not residential). The trial judge treated the question whether I-55 was outside a business district as an open question of fact and submitted it to the jury. This, too, was error.
Administratrix fails ultimately on both points. The solution to the problems created by Instructions Nos. 11 and 13 was within her grasp when she requested and the trial judge granted two negligence per se instructions, Nos. 37 and 38. Administratrix should have withdrawn Nos. 11 and 13.
Administratrix's entitlement to reversal on the business district issue meets the same fate. True, Freeman/Long requested and were granted Instructions Nos. 27 and 28. These instructions erroneously submitted to the jury the question whether the scene was within a business district. Administratrix did not object on this ground as required by Rule 42, Miss. Sup.Ct. Rules. She compounded her sins by requesting Instructions Nos. 11, 37 and 38, each of which erroneously submits the business district issue to the jury.
For these reasons, we must reject any assignment of error predicated on these points.

B. "Business District"

The concept of a business district applicable in this case originates in a 1938 enactment of the Mississippi Legislature. Miss. Code Ann. § 63-3-139(a) (1972) provides:
"Business district" means the territory contiguous to and including a highway when 50 per cent or more of the frontage thereon for a distance of 300 feet or more is occupied by buildings in use for business.
The applicable federal definition, codified in 49 C.F.R. § 390.12 (1983), is essentially the same.
The term "business district" means the territory contiguous to and including a *705 highway when within any 600 feet along such highway there are buildings in use for business or industrial purposes, ..., which occupy at least 300 feet of frontage on one side or 300 feet collectively on both sides of the highway.
Through Instructions Nos. 8 and 12, the trial judge gave the jury the definition of business district found in § 63-3-139(a) and § 390.12 and then, via Instructions Nos. 11, 27, 28, 37 and 38, asked the jury whether the site of the accident was one.
To be sure, the real property abutting the frontage road is all zoned commercial. There are a number of businesses whose premises are situated within 300 feet of the scene of the accident. The distance from the west edge of the southbound traffic lanes of I-55 to the southeast corner of the "McGhee Building," is approximately 178 feet; to the southeast corner of the "Steak House" is approximately 152 feet; to the southeast corner of the "Burger King" is approximately 127 feet; and to the southeast corner of "Holmes Volkswagen" is approximately 118 feet. Proceeding south from the scene of the accident, the main portion of the "Holiday Inn" motel building is approximately 140 feet from the west edge of the southbound traffic lanes of I-55.
We hold, nevertheless, as a matter of law, a limited-access interstate highway such as I-55 is not within a business or residence district within the meaning either of the Uniform Highway Traffic Regulation Law, codified in §§ 63-3-1 et seq., or of Federal Highway Administration Regulation § 390.12. This is so even though the area in question may be found within the corporate limits of an incorporated municipality. It is no less so even if businesses or residences may be geographically proximate and highly visible so long as they front on frontage or access roads and not on the interstate highway itself.
First and narrowly, the area in question is not within a business district because it does not meet the plain language of either the statute or the regulation. The definitions we have been given refer to businesses located on lands contiguous to and including a highway when 50 percent or more of the frontage thereon for a distance of 300 feet or more is occupied by buildings in use for business. None of the territory contiguous to the frontage on Interstate 55 is used for business. What exists to the westerly (or right-hand) side of I-55 is a grassy depression and embankment adjoined by a frontage road which itself provides two lanes of travel. The businesses in the area front on the frontage road, not on I-55.
More fundamentally, a controlled-access interstate highway running through a business area simply does not have the attributes of a street or highway running through a business or residence district as contemplated by our legislature in the year 1938. We emphasize the scheme of the statute. The safety obligations imposed upon the drivers of automobiles stopping on highways at night are greater if highways are outside a business district than if they are within a business district. The reasons why this is so apparent: there is simply greater danger of an accident outside of a business district.
For one thing, outside a business district, the maximum speed limit is commonly much higher than that allowed within a business district. Vehicles approaching a stalled or parked vehicle on a highway outside a business district would be expected to be travelling faster and thus have less time to stop than within a business district. Moreover, lighting conditions are reasonably expected to be much better within the business district than outside it. Inside a business or residence district cars are regularly parked on the side of the road. Encountering a parked or stalled car is simply something that one should reasonably anticipate within a business or residence district.
An interstate expressway that goes through heavily populated municipal areas is designed to speed the flow of traffic and, as much as possible, to simulate the traffic conditions found on all other parts of the interstate system. Motorists reasonably *706 expect that they will encounter no stopped vehicles within regular lanes of travel. Indeed, the system is designed so that the driver will be free from worry about turning, slow moving or stalled automobiles. Except at rush hour times, the motorist utilizing I-55 or the other interstate highways of Jackson normally slows his pace little from that he would employ 25 miles north of town where clearly he would be outside a business district.
We have no cases which consider whether an interstate highway within a municipality may be considered a highway within a business district within the meaning and comtemplation of § 63-3-903(1). However, Powers v. Malley, 302 So.2d 262 (Miss. 1974), is a step toward today's decision. The accident in Powers occurred on U.S. Highway 90 along the Mississippi Gulf Coast. That the incident in question took place within the corporate limits of Long Beach did not prevent the Court from holding that it was outside a business district.
A recent case from our sister state of Louisiana is more nearly on point. Butler v. Travelers Insurance Co., 323 So.2d 250 (La. Ct. App. 1975), arose out of an accident on Interstate Highway 10, and elevated, controlled-access highway, in the heart of Baton Rouge. The Court held that a section of the interstate highway system with high speed limits and controlled access is not rendered within a business district
"merely because the section in question is within the proximity of a business or residential district." 323 So.2d at 254.
Without further ado, the trial judge should have held as a matter of law that the scene of the accident was outside of a "business district". We regard this as so whether Mississippi's § 63-3-139 or the Federal Highway Administration's § 390.12 be deemed of controlling force.[5] Because the submission of this issue to the jury, considering the structure of the other state statutes and federal regulations, could reasonably have produced the defense verdict, the error rises to reversible proportions.
Because of her failure to object in the trial court in conformity with our Rule 42 and because she requested and was granted three equally bad instructions, Appellant Administratrix is precluded from taking advantage of this error.
In this connection we note that Appellant Administratrix has assigned as error the granting, at Defendants' request, of Instruction No. 28. The substance of that instruction pertains to putting out reflectors or other signals to warn approaching vehicles.[6] One defect in the instruction is that it submits to the jury the question whether the accident occurred within or outside a business district as though there were conflicting evidence on that point. As explained, however, Appellant has precluded herself from reversal on this ground. We find no other error in Instruction No. 28.

C. The Standard of Care Applicable to Freeman/Long

Having decided that Kirk Harrison Stong met his demise outside a business district, *707 we confront two safety standards to which Freeman and Long were subject. First, Long was required to pull off the road to the extent practicable. Miss. Code Ann. § 63-3-903(1) (1972); 49 C.F.R. § 392.21 (1983). Second, Long was required with reasonable promptness to put in place reflectors or other signals designed to warn approaching vehicles. Miss. Code Ann. § 63-7-71(1) (1972); 49 C.F.R. § 392.22(b) (1983). There are state and federal counterparts for each standard.
The reasons why these statutes furnish our standard of care are familiar. See Restatement (Second) of Torts, § 286 (1965) (reasonable man standard may be defined by legislation); see also Georgia Pacific Corporation v. Armstrong, 451 So.2d 201 (Miss., 1984); Haver v. Hinson, 385 So.2d 605, 608 (Miss. 1980) (statutes delineate what is negligent conduct); Munford, Inc. v. Peterson, 368 So.2d 213, 217 (Miss. 1979) (same); Powers v. Malley, 302 So.2d 262, 264-65 (Miss. 1974) (same); and, most important, U-Haul Co. v. White, 232 So.2d 705, 708 (Miss. 1970) (same).
Sections 63-3-903 and 63-7-71 were enacted by our legislature to protect motorists on our highways. They made unlawful conduct found to have been the frequent cause of accidents and were designed to deter that conduct.[7] In sum, these statutes were intended to safeguard life and limb. Kirk Harrison Stong, were he drunk or were he sober on July 4, 1980, was within the scope of the intended protections of these statutes.[8]
The same may be said of the federal regulations. Freeman Truck Lines is a certificated common carrier subject to federal regulation. The Federal Highway Administration and its predecessor in authority, acting well within the scope of the authority vested in them by the Congress, have promulgated a series of highway safety regulations, among which are 49 C.F.R. §§ 392.21-392.22. By their terms these regulations apply to this case. They, too, furnish standards of care by which Long's conduct must be judged. See Restatement (Second) of Torts § 286 (1965) (reasonable man standard may be defined by administrative regulations); Brandes v. Burbank, 613 F.2d 658, 664-65 (7th Cir.1980) (reasonable man standard defined by reference to federal highway safety regulations); NeSmith v. Bowden, 17 Wash. App. 602, 607-08, 563 P.2d 1322, 1325-1326 (1977) (same).

1. Pull Off the Road When Practical

a. The Mississippi Statute

Considering the state standard first, we find that § 63-3-903 provides as follows:
(1) No person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled part of any highway outside of a business or residence district when it is practical to stop, park, or so leave such vehicle off such part of said highway... .
The effect of the statute is to provide that no person shall stop his motor vehicle on "the main traveled part" of the highway "when it is practical" to stop off the highway. See Whitten v. Land, 188 So.2d 246, 249 (Miss. 1966) (these phrases in the statute pose a question of fact); Hankins v. *708 Harvey, 248 Miss. 639, 657-59, 160 So.2d 63, 70-71 (1964) (same); Gulf Refining Co. v. Brown, 196 Miss. 131, 146-47, 16 So.2d 765, 767 (1944) (same). Our question is whether it was reasonably practical for Long to pull his truck off of the main traveled right hand or westerly land of I-55, not whether it was merely possible for him to have done so.
This question is ordinarily one of fact to be submitted to the jury on proper instructions. Compare Maness v. Illinois Central Railroad Company, 271 So.2d 418, 425-26 (Miss. 1972) (issue is a jury question); Hankins v. Harvey, 248 Miss. at 656-59, 160 So.2d at 69-71 (same); with Gulf Refining Co. v. Brown, 196 Miss. at 144, 16 So.2d at 767 (trial judge warranted in finding violation). We may take such issues from the jury only where, under our familiar test, the facts are so clear that reasonable minds could not differ. See, e.g., City of Jackson v. Locklar, 431 So.2d 475, 478-79 (Miss. 1983) (standard for removing issues from the jury); Paymaster Oil Co. v. Mitchell, 319 So.2d 652, 656-57 (Miss. 1975) (same); General Tire and Rubber Co. v. Darnell, 221 So.2d 104, 105-07 (Miss. 1969) (same).
Yet, this is precisely what Appellant Administratrix would have us do. She argues that there is no credible evidence in the record contradicting her evidence which, indeed, does suggest that it would have been practical for Long to have pulled his truck entirely on to the shoulder of I-55 and out of the main-traveled lane of traffic.
Appellant Administratrix would have us hold that the only circumstance relevant to the practicality issue is whether there was physically enough room to the side of the highway to get the truck safely off the main-traveled lane. Admittedly there was here a shoulder to the west of Long's truck of adequate contour and width. We do not read the statute so narrowly. To be sure the physical makeup of the premises is an important factor relevant to practicality. Teche Lines, Inc. v. Danforth, 195 Miss. 226, 249, 12 So.2d 784, 786 (1943). By no means is it the only factor that may ever be relevant.
Freeman and Long argue that it would not have been practical for Long to pull off the main traveled right-hand lane of I-55 and allow a stalled, abandoned, unlit vehicle to remain. This is especially so when it is remembered that the abandoned vehicle had already caused one driver to lose control of his car in an attempt to avoid a collision. The evidence favorable to Freeman and Long suggests that the rear of the Freeman truck had reflectors that could be seen from a distance. In addition, Long activated his red emergency flashers. According to one witness, these could be seen as far as a mile back up the highway.
Long's temporary actions arguably improved the safety of the scene vis-a-vis southbound oncoming traffic. We say "temporary" because at the time the fatal accident occurred Long's plan to improve further the safety of the scene was in the process of implementation; the police officer was speeding down the frontage road so that he could position his car, his blue flashers activated, above the Freeman truck to warn approaching motorists of the danger.
In this context we cannot  and will not  say as a matter of law that it was not practical for Long to position his truck as he did. By the same token we do not imply that Long's conduct was immune from criticism. We hold that on this record a jury issue was presented. Appellant Administratrix was not entitled to a peremptory instruction on the practicality issue based on the state statute.

b. The Federal Regulation

The federal regulation is similar but not identical. It provides, in 49 C.F.R. § 392.21, that
No motor vehicle shall be stopped, parked, or left standing, whether attended or unattended, upon the traveled portion of any highway outside of a business or residential district, when it is practicable to stop, park, or leave such vehicle off the traveled portion of the highway.
*709 Here as elsewhere in this opinion we must keep in mind the clearly stated federal policy: the Federal Highway Administration's regulations in no way displace state law unless they "impose a higher standard of care than that law". 49 C.F.R. § 392.2. Otherwise federal regulations require that
Every motor vehicle must be operated in accordance with the laws, ordinances and regulations of the jurisdiction in which it is being operated. 49 C.F.R. § 392.2.
The question before us is whether § 392.21 of the federal regulations imposes a higher standard of care than Mississippi's § 63-3-903. We have carefully studied and compared the two. Though slightly different wording is employed, we regard that they impose a legally identical standard of care upon Freeman/Long.
Federal Regulation § 392.21, like Mississippi's § 63-3-903, applies only "outside a business or residential district". Indeed, the first sentence of federal § 392.21 is virtually identical to the first sentence of state § 63-3-903(1). The federal regulation uses the word "practicable" in place of the state statute's "practical". The sixth definition of "practical", in Webster's Third New International Dictionary 1780 (1971), is "practicable". Though there are differences between the two words, the draftsmen of statutes and regulations can hardly be held to know them, nor judges to pay them any mind, when the meaning intended in one instance is so obviously the same as in the other.
Predicating Appellant Administratrix' claim that Long was negligent in failing to pull off the road upon 49 C.F.R. § 392.21 adds nothing to the claim already asserted based on § 63-3-903(1). Technically, of course, she was entitled to have that claim submitted to the jury. See Whitfield Tank Lines v. Navajo Freight Lines, 90 N.M. App. 454, 458, 564 P.2d 1336, 1340 (1977) (party entitled to instruction on a theory of violation of federal highway safety regulations if pled and supported by evidence). As a practical matter, artfully drafted jury instructions covering the state § 63-3-903(1) claim would be sufficient to cover the claim based on the federal regulations.[9]
Having held that a jury question was presented under state § 63-3-903(1), we hold likewise under the federal regulation. Appellant Administratrix was not entitled to a peremptory instruction on the breach of duty issue here.

2. Place Warning Signals to Warn Approaching Vehicles

There are state and federal components to Appellant Administratrix's next claim. For comparison we juxtapose the salient provisions of federal § 392.22 with state § 63-7-71.
Miss. Code Ann. § 63-7-71(1) (1972) in relevant part reads as follows:
(1) Whenever any motor truck or bus is stopped upon the highway ..., the driver or other person in charge of such vehicle shall cause such flares, fuses, reflectors, or other signals to be lighted or otherwise placed in an operating condition and placed upon the highway, one at a distance of approximately one hundred feet to the rear of the vehicle, one approximately one hundred feet in advance of the vehicle and the third upon the roadway side of the vehicle... .
The situation presented by the federal regulation covering the placement of warning devices is similar, although the more recently drafted federal regulation makes provision for multi-lane divided highways such as is involved here. The regulation provides, in 49 C.F.R. § 392.22(b), as follows:
(b) Placement of Warning Devices 
(1) General Rule. Except as provided in paragraph (b)(2) of this section, whenever a vehicle is stopped upon the traveled portion of a highway or the shoulder *710 of a highway for any cause other than necessary traffic stops, the driver shall as soon as possible, but in any event within 10 minutes, place ... warning devices... .
(2)(v) Divided or one-way roads. If a motor vehicle is stopped upon the traveled portion or the shoulder of a divided or one-way highway, the driver shall place the warning devices required by paragraph (b)(1) of this section, one warning device at a distance of 200 feet and one warning device at a distance of 100 feet in a direction toward approaching traffic in the center of the lane or shoulder occupied by the vehicle. He shall place one warning device at the traffic side of the vehicle within 10 feet of the rear of the vehicle.
Under either the state or the federal standard, because Long stopped his truck on a highway outside of a business district, he was required to put out reflectors or other signals.[10] Both the state statute and the federal regulation require the placement of three devices. One flashing blue lighted patrol car will suffice generically but not numerically. On these facts Long did not comply with the state and federal standards for placing three devices by the time the accident occurred, or more precisely, at the time of the accident Long had not yet complied. This does not mean, however, that Long was necessarily liable under either standard.[11]
Under the state statute, a driver is not required to place flares, reflectors or other signals immediately. Hankins v. Harvey holds "immediately means only that it be put out with reasonable and proper diligence, or promptly under all the facts and circumstances of the case." 160 So.2d at 69.
There is a surface difference between the state statute and the federal regulation in the language describing the amount of time Long had to effect his warning light system. Whereas Mississippi's § 63-7-71(1) has been construed by this Court to require reasonable promptness and diligence under the facts and circumstances of the particular case, the federal regulation § 392.22(b)(1) requires that the driver shall act "as soon as possible, but in any event within 10 minutes, ..."
We regard the state statute and the federal regulation as imposing essentially similar standards. Normally the reasonable promptness and diligence required by the state statute will require action in ten minutes. In any event, under the facts in this case, the witnesses have established a range of time between the moment Long stopped his truck until the fatal accident at between four and ten minutes. The evidence is certainly not so clear that we have an unquestionable violation of the time feature of either the federal regulation or the state statute. Where there is a conflict in the evidence and where more than one reasonable interpretation may be given the facts, whether the driver acted with reasonable promptness under the circumstances or within a ten minute time limit must be determined by the jury under proper instructions. See, e.g., Powers v. Malley, 302 So.2d 262, 264-65 (Miss. 1974) (issue should have been submitted to jury on proper instructions); Maness v. Illinois Cent. R.R. Co., 271 So.2d 418, 425 (Miss. 1972) (issue is a jury question); Hankins v. Harvey, 248 Miss. 639, 656, 160 So.2d 63, 69 (1964) (same) (minority position of Kyle, *711 J.); Planters Wholesale Grocery Co. v. Kincade, 210 Miss. 712, 717, 720-23, 50 So.2d 578, 581, 585 (1951) (same).
Even though Long had not yet complied with the state or federal standard by placing three devices to warn oncoming traffic, we can only hold that reasonable minds could differ on whether Long acted with the required promptness and diligence. Unless on uncontradicted facts Long's ten minutes or his time for acting with reasonable promptness had expired, we do not reach the question whether he violated the numerical component of the requirement for putting out warning devices. Appellant Administratrix is not entitled to a peremptory instruction that Long violated either the state or federal traffic laws.

3. Negligence Per Se Instructions Should Have Been Given

Administratrix' point under this assignment of error, however, is not wholly without merit. She argues alternatively that violation of the statutory standards, if she could convince the jury that such occurred, was negligence per se and not mere evidence of negligence. In this she is correct. As we have explained above, however, she has waived the point.
At the risk of repetition, this waiver occurred when Administratrix requested and was granted two negligence per se instructions, Nos. 37 and 38, and then failed to withdraw the two otherwise comparable mere evidence of negligence instructions, Nos. 11 and 13. See pages 701, 704 above.
Administratrix' waiver in no way derives from her having requested the two alternative mere evidence of negligence instructions. This, it will be remembered, was done in the face of the trial judge's refusal to grant her original negligence per se instructions, Nos. 6, 9 and 10. Indeed, if the instruction conference had ended there, the submission of Nos. 11 and 13 to the jury would have constituted reversible error, for there is no question but that those two instructions contain an erroneous statement of the law on a material point.
Our cases establish that, where a party requests a correct instruction only to have it refused by the trial judge, that party does not, by requesting another instruction bowing to the trial judge's ruling, waive the right to assign as error on appeal the refusal of the correct instruction. Home Insurance Company of New York v. Dahmer, 167 Miss. 893, 901, 150 So. 650, 652 (1933); Foster v. City of Meridian, 150 Miss. 715, 728, 116 So. 820, 823 (1928). At trial, an attorney on his oath is twice obligated. He must with warm zeal and all good fidelity advance the cause of his client. At the same time, he is expected to accept and respect rulings of the trial court once finally made. The tension in these two obligations is most felt by the lawyer when the trial judge rules against his client on a point where the lawyer's experience and knowledge inform him that the trial judge is wrong.
When the trial judge makes a ruling adverse to a litigant, and where that litigant's lawyer has properly noted his objection, that litigant and his lawyer are entitled to try the rest of the case on the assumption that the trial judge's ruling will not be disturbed on appeal. And, when that litigant reaches this Court we will not imply a waiver from the subsequent conduct which does nothing more than show the lawyer's obligatory respect for the trial judge while at the same time continuing as best can be done the advancement of his client's cause.
We reaffirm this rule today for it is wholly consistent with what we hold here: that at the end of the instruction conference Administratrix requested and was granted two perfectly good negligence per se instructions[12] and that at that point she *712 had the duty to withdraw Instruction Nos. 11 and 13, the alternative mere evidence of negligence instructions which had been granted at her drudging request earlier. It is her failure to withdraw Nos. 11 and 13 that works the waiver, not her having requested them in the first place.

IV. The Intoxication Issue

A. Introduction

The other major area of controversy concerns Kirk Stong's alleged intoxication prior to the accident. Two assignments of error are presented.
Freeman/Long challenge the trial judge's refusal to admit the results of a blood alcohol test performed on Stong's remains. Appellant Administratrix successfully kept from the jury's view the highly incriminating blood test results and now goes for broke arguing that there was insufficient evidence to submit the intoxication issue to the jury at all.
We reject each side's assignment of error.

B. Admissibility of the Blood Alcohol Test

1. The Statutory Prohibition

The record reflects that several hours following the accident, and after Stong had been pronounced dead, a blood sample was taken from his heart. This sample was tested and found to contain.17 grams of ether alcohol per 100 ml. of blood. Coupled with the passage of time, this would indicate that Stong was highly intoxicated at the time of the accident in question.
Prior to trial Administratrix filed a motion in limine, citing Miss. Code Ann. § 63-11-43 (1972) which provides:
"Neither results of a chemical test under the provisions of this chapter, nor the fact of submission to or refusal of such test shall be admissible in a civil case."[13]
The trial judge sustained the motion in limine and refused to allow the defense in any way to present to the jury the results of the blood test.
On cross appeal, Freeman/Long argued vigorously that the trial judge's ruling was in error. We disagree.
The statute by its own terms clearly covers this case. It refers first to the "results of a chemical test". As any high school chemistry student knows, a blood test is a chemical test. While lawmakers certainly have the power and authority to define terms in ways that may surprise devotees of the dictionary, see, e.g., McLaurin v. Mississippi Employment Security Commission, 435 So.2d 1170, 1171-1172 (Miss. 1983) (the term "unemployed" arbitrarily defined by legislature), we find no evidence that the legislature has done so here. A blood test is a type of chemical test.
More legalistically, the blood test in question was a chemical test "under the provisions of this chapter". The words "this chapter" no doubt refer to Chapter 11 of Title 63 of the Mississippi Code of 1972. That chapter is commonly known as the Mississippi Implied Consent Law. Section 7 of Chapter 11 [§ 63-11-7] authorizes and establishes procedures for obtaining blood tests from persons "unconscious or dead as a result of an accident". Section 9 [§ 63-11-9] says who may perform the test. The blood test performed upon the remains of Kirk Harrison Stong was performed under this authority.
Section 63-11-7 significantly provides
"It is the intent of this chapter that blood samples taken under this section shall be used exclusively for statistical evaluation of accident causes with safeguards established *713 to protect the identity of such victims and to extend the rights of privileged communications to those engaged in taking, handling and evaluating such statistical evidence".
We are fully cognizant of the impact of this ruling upon the defense (although a defense verdict was obtained in spite of Freeman/Long's inability to prove the results of the blood test). Whether Stong was intoxicated was an important issue in the case. The blood test involved is certainly highly credible evidence of that intoxication. The clear wording of § 63-11-43 coupled with the statement of legislative intent articulated in § 63-11-7 proscribe receipt of the results of this test into evidence in this case.[14]

2. The Waiver Argument

In the alternative, conceding inadmissibility as an original proposition, Freeman/Long argue that Appellant Administratrix waived her § 63-11-43 objection through her actions during discovery. In their answer Defendants alleged as an affirmative defense that Stong was intoxicated at the time of the accident. Administratrix served interrogatories requesting the factual basis upon which this affirmative allegation had been made. These interrogatories were served under the authority of Miss. Code Ann. § 13-1-233 (1972). Defendants now claim that, since they were forced to reveal under oath the existence of this otherwise inadmissible matter, Administratrix has waived her statutory objection.
The suggestion that one waives an objection to admissibility by inquiring into the matter on discovery is wholly inconsistent with the nature and purpose of our discovery rules.[15] This is so whether we refer to the Mississippi Rules of Civil Procedure, Rules 26-37, which became effective January 1, 1982, or to Chapter 501 of the Laws of Mississippi, 1975, which was in effect between January 1, 1976, and January 1, 1982.
The general discovery statute in effect at the time this action arose was § 13-1-226(b)(1) provided in relevant part
"It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence".
The result of the blood test, suggesting as it does that Stong was highly intoxicated, is the sort of discoverable information which to us appears reasonably calculated to lead to the discovery of other evidence of Stong's intoxication that may be admissible. Discovery is a stage of the proceedings entirely separate and apart from trial. The idea is to encourage full disclosure of all relevant facts and circumstances. Questions of admissibility are wholly reserved for trial, or at least for the post-discovery pre-trial period.
Our rules have been shaped to assure that each party knows all of the relevant facts and circumstances so that the question of admissibility can be fully presented to the trial judge. To provide that one *714 inquires into sensitive areas at the peril of waiving for trial purposes otherwise valid objections to admissibility would be wholly inconsistent with the purpose and philosophy of our discovery procedures. We hold as a matter of law that Administratrix' inquiry into the basis of Freeman/Long's affirmative defense of intoxication constitutes no waiver of her right to invoke § 63-11-43 in opposition to the admissibility of the results of the blood test.

C. Intoxication As A Jury Question

At the trial of this case the parties stipulated that Kirk Harrison Stong had been drinking in the twenty-four hours prior to the accident. The evidence established that Stong had been to a pre-Fourth of July fish fry where beer had been served.
On appeal, Administratrix contends that the evidence was insufficient to support the granting of several instructions relating to Stong's possible intoxication. These instructions provided, in effect, that if the jury believed that Stong operated his motor vehicle under the influence of intoxicating liquor or that he did not maintain his automobile under reasonable control or at a reasonable rate of speed, the jury could consider this fact against Plaintiff's case to the extent that it influenced causation.
Freeman/Long argue convincingly that there is a further evidentiary base for the intoxication instructions. The evidence reflects that during the time the Freeman truck was parked on the highway some 50 to 100 motor vehicles passed the scene using the left-hand southbound lane of travel without incident. The only other vehicle which encountered the scene and had trouble was also operated by one who had been drinking. The uncontradicted evidence is that Stong never applied his brakes but merely drove at full speed head-on into the rear of the Freeman truck. No skid marks were found. No witness saw Stong's brake lights come on. This evidence, coupled with the stipulation regarding Stong's drinking, was surely sufficient to support the intoxication instruction.
Shaw v. Phillips, 193 So.2d 717, 718-19 (Miss. 1967) and Allen v. Blanks, 384 So.2d 63, 67-68 (Miss. 1980) undergird the proposition that, where there is evidence sufficient to support a jury finding of intoxication (employing the familiar standard of Paymaster Oil), the question should be presented to the jury on proper instructions. The evidence presented at trial below was more than sufficient, as a result of which this assignment of error must be rejected.

D. Summary

In summary, the trial judge's decision in sustaining the motion in limine precluding admission of the results of the blood alcohol test was correct. Adding this to all that has been said in Section III above, the judgment of the Circuit Court is affirmed.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, HAWKINS, PRATHER and SULLIVAN, JJ., concur.
DAN M. LEE, J., takes no part.
NOTES
[1] The description of the scene of this accident and the surrounding area is taken from the record and reflects conditions which existed on July 4, 1980. The major repairs and improvements being made in the area in 1984 are, of course, of no relevance to the determination of this action.
[2] See Miss. Code Ann. § 63-3-903 (1972) (stopping outside business district); id. § 63-7-71 (use of warning devices). These statutes were initially promulgated in 1938 under Chapter 200 of The Laws of Mississippi.
[3] See 49 C.F.R. §§ 392.21-22 (1983). The power to promulgate regulations of this type derives from the Interstate Commerce Act passed in 1887. 49 U.S.C. § 301 et seq. (1983). Beginning in 1966, this regulatory power was transferred in piecemeal installments from the Department of Commerce to the Department of Transportation. 49 U.S.C. § 1655 (1983). Authority to augment the regulations has been transferred within the Department of Transportation pursuant to 49 C.F.R. §§ 1.48 and 301.60 (1983). Within the Department of Transportation these regulations are administered by the Federal Highway Administration. They are sometimes referred to below as the Federal Highway Administration's regulations for in 1980 that is what they were. No relevant parts of §§ 392.21 to -22 have been amended since the accident, so the current version in the Code is applicable to this case.
[4] Plaintiff Administratrix submitted this theory to the trial judge via requested Jury Instruction No. 5. That instruction would have charged the jury that Freeman/Long were negligent as a matter of law for their failure to conform to the safety standards found in the state statutes and federal regulations. That instruction was refused by the trial judge. The point  together with all alternative subsidiary points fairly encompassed therein  is before us via Assignment of Error No. 1.
[5] We recognize that the federal definition of business district was promulgated in 1968. 33 Fed.Reg. 19728 (1968). By that year much of the nation's interstate highway system was in existence. Nothing in the federal definition or in any subsequent interpretation suggests that an interstate highway may ever be said to be in a business district.
[6] Instruction No. 28 in its entirety reads as follows:

"The Court instructs the jury that under the law of the state of Mississippi, the driver of a motor truck is only required to place flares, reflectors or other signals on the highway around his stopped motor truck if his motor truck is stopped on a highway outside of a business district. The Court further instructs the jury that the placing of such flares, reflectors or other signals is only required to be done within a reasonable time and when the driver has a practical opportunity to do so. Therefore, should you find from a preponderance of the evidence in this case that the motor truck of the defendants was stopped on a highway within a business district, or that the defendants had not had a reasonable time or practical opportunity to place such flares, reflectors or signals around his truck, then in that event you cannot return a verdict for the plaintiff simply because the defendants did not place any flares, reflectors or other signals around the motor truck stopped in the highways."
[7] Violations of these statutes are made misdemeanors and criminal penalties have been authorized. Miss. Code Ann. §§ 63-3-201 and 63-7-7 (1972). No express private rights of action have been created, although §§ 63-3-11 and 63-7-81 make it clear that nothing in the statutes

shall be construed as to curtail or abridge the right of any person to prosecute a civil suit for damages by reason of injuries to person or property resulting from the negligent use of the highway by any motor vehicle, or its owner, or his employee or agent.
By reason of the authorities cited above it is much too late to question that these statutes furnish the standard of care of a reasonable man and that deviations constitute negligence per se.
[8] That a person may have been intoxicated does not operate to deprive him of protections otherwise afforded by law. Cf. Dickerson v. State, 441 So.2d 536, 538 (Miss. 1983) (homicide laws protect "drunks as well as deacons"); City of Jackson v. Locklar, 431 So.2d 475, 477 n. 1 (Miss. 1983) (protruding manhole indifferent to whether driver is "high or dry").
[9] At trial the jury was given separate instructions covering the essential elements of the claims under the state statute and federal regulations. While this is not error, it is unfortunate. Confusion in the minds of jurors is bound to result. Where the litigation of an action is controlled by comparable federal and state rules and where the elements of the claims or defenses under each are similar to the other, a single instruction will generally suffice.
[10] The case of Ashe v. Hughes, 219 Miss. 395, 399, 69 So.2d 210, 212 (1954), misreads Miss. Code § 8256 (1942) (recodified as Miss. Code Ann. § 63-7-71 (1972) to apply only to "disabled" vehicles. This error apparently stems from ignoring where the commas are placed in the statute.
[11] We note that, even though a single flashing blue light on a police car as a warning device may not satisfy the three-warning device component of the safety standards, this use of the flashing blue light may significantly impact on the proximate cause analysis. For example, if a jury found that a flashing blue light on a policeman's car would give more visual warning to oncoming cars than would the three devices specified in the state or federal traffic laws, the failure to employ three non-flashing devices could not be the proximate cause of the accident.
[12] We have explained above that we regard the substantive components of the state statutory version of the pull-off-the-road-when-practical issue to be legally synonymous with that found in the federal highway safety regulation. Similarly we have concluded that the state statute and federal regulation articulating the place-signals-to-warn-approaching-vehicles, properly construed, say essentially the same thing.

In this context, when Instruction No. 37 submits the pull-off-the-road-when-practical issue to the jury in negligence per se terms, it submits both state and federal varieties of that theory of negligence. Similarly, when Instruction No. 38 submits the place-signals-to-warn-approaching-vehicles issue in negligence per se terms, that instruction likewise submits both state and federal varieties. Indeed, Instruction Nos. 37 and 38 come close to being the "single instruction" we contemplate in note 9 above.
[13] The statute is mentioned in passing in Allen v. Blanks, 384 So.2d 63, 66 (Miss. 1980). Otherwise, this is our first occasion to consider its meaning and enforcement.
[14] The single most probative item of evidence on the intoxication issue was the blood test. Yet we are told by § 63-11-43 that the jury must resolve this important issue on the basis of much less reliable evidence a part of which is circumstantial. We are conscious of the statement of legislative intent found in § 63-11-7 and in this instance we respect it. Assuming that our purpose in the trial process is to seek the truth, to achieve a just determination of each action, and to resolve litigation under procedural and evidentiary rules everyone would regard as fair and impartial, there is no discernible reason why evidence of the results of the blood test should not have been admissible, subject, of course, to cross-examination and such counter-attack as Administratrix may have made.
[15] Fant v. Fant, 173 Miss. 472, 162 So. 159 (1935) is of no significance. That case holds that the dead man statute is waived when the party entitled to invoke it compels his adversary to testify. 173 Miss. at 486. Fant refers to evidence being obtained for use at trial  in an era when there was no pre-trial discovery. Fant is very different from the case we have here where Administratrix asked a garden variety open ended discovery question in a context where the law is clear that all potential objections to receipt of the answer in evidence were reserved until trial.