461 So.2d 686 (1984)
Gregory Montecarlo JONES
v.
STATE of Mississippi.
No. 54067.
Supreme Court of Mississippi.
November 28, 1984.
*688 Robert E. Farish, J.W. Miller, Biloxi, for appellant.
Bill Allain, Atty. Gen. by Robert D. Findley and Amy D. Whitten, Sp. Asst. Attys. Gen., Jackson, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
Dispositive of the instant capital murder appeal is the question whether, once one criminally accused has waived his constitutional privilege against self-incrimination and begun making inculpatory statements, he may in the middle of interrogation invoke a privilege against further self-incrimination. Under the established criminal constitutional jurisprudence of this land, the accused is so entitled.
In the case at bar, Gregory Montecarlo Jones made substantial inculpatory statements regarding a homicide that occurred in Biloxi, Mississippi. When pressured to admit that he had acted alone and without an accomplice, Jones twice replied "I prefer not to speak on that". He thus effectively invoked his privilege against further self-incrimination. Because Jones' request was not scrupulously honored, his subsequent incriminating statements were as a matter of law unconstitutionally obtained and should not have been received in evidence against him at trial. Because these subsequent incriminating statements, in the form of a videotaped confession, were presented to the jury, Jones' conviction of capital murder and sentence of death must be vacated and the case remanded for a new trial.
We reverse Jones' conviction of capital murder and remand for a new trial. En route we will discuss those assignments of error regarding issues which need to be settled prior to Jones' new trial.

II.

A.
On the morning of January 21, 1981, officers of the police department for Biloxi, Mississippi, received a call to investigate a homicide at 629 Lameuse Street in Biloxi. Upon entering the home, officers found Josie Lincoln Jones, a 62-year-old female, lying dead on her living room floor. Ms. Jones had been fatally wounded by three bullets fired from a .22 caliber, single-shot, bolt-action rifle. The rifle was found on the floor near her body.
The victim, Josie Jones, had been living in this home with a man named Alexis Kingston. Gregory Montecarlo Jones, a/k/a Sonny Jones (sometimes hereinafter "the defendant"), had been a tenant or boarder in the house. Shortly before the incident in question, Kingston had been the victim of a debilitating stroke and had been hospitalized. Thereafter and until January 19, 1981, the only occupant of the home other than Josie Jones was Gregory Montecarlo Jones. Josie Jones and Gregory Montecarlo Jones were and are wholly unrelated to each other either by blood or marriage.
The officers immediately commenced an investigation into the circumstances surrounding the death of Josie Jones. No eyewitnesses could be located, nor have any since been identified. Neighbors advised police that a young man had been boarding with Ms. Jones and that he had not been seen since Monday, January 19, 1981  the last day anyone saw Ms. Jones alive. The investigators pieced together enough information to suggest that the boarder was known as Sonny Jones and was originally from Perry County. They *689 also had reason to believe that Sonny Jones had left town in a pickup truck which belonged either to Ms. Jones or to Alexis Kingston.
On the basis of this information, at approximately 10:00 o'clock on the morning of January 21, 1981, Biloxi police officials called Perry County. They inquired of the Perry County Sheriff's office whether anyone knew of Sonny Jones. In the course of this conversation, Perry County Deputy Sheriff Robert Cowart advised that on the previous evening a pickup truck with a Harrison County license tag had been towed into New Augusta in Perry County following the driver's arrest for driving under the influence of intoxicating liquors. It quickly became apparent that the truck was probably the one missing from Ms. Jones' home and that the driver was probably Sonny Jones.
On the preceding evening between 9:00 and 10:00 p.m., James Barnes, a Perry County constable, had encountered a pickup truck sitting in the middle of the Highway 42 west of Richton, Mississippi. The driver was slumped over the steering wheel, apparently having passed out. The headlights had been turned off. The engine was still running. The driver was Gregory Montecarlo Jones, the defendant below. Constable Barnes administered to Jones a breath analysis test which resulted in a reading of .11 percent alcohol. He then placed Jones under arrest for operating a motor vehicle under the influence of intoxicating liquors. Miss. Code Ann. § 63-11-30(1)(c) (Supp. 1983). Jones was incarcerated in the Perry County jail in New Augusta, Mississippi, and his truck was impounded by Perry County law enforcement officials. Jones was still in jail in New Augusta when the inquiries about a Sonny Jones were received from Biloxi police officials the following morning.
Shortly after having been advised of the homicide of Ms. Jones in Biloxi, Perry County Deputy Cowart told the defendant that he was being charged with murder. Cowart advised Jones of his Miranda[1] rights. Jones agreed to waive those rights and began talking with Perry County officials. By 11:30 a.m., he had given an inculpatory statement in which he had admitted complicity in the robbery and death of Ms. Jones. Significantly, at this time, defendant insisted that an accomplice instigated the robbery and fired the fatal shots.
When Biloxi police investigators arrived, defendant told them essentially the same story, that is, that he had had an accomplice and that his accomplice had actually committed the murder. At 1:00 o'clock that afternoon, law enforcement officials, led by Officer Robert Payne of Biloxi Police Department, determined to take Jones to Hattiesburg to obtain a videotape recording of his inculpatory statement. The videotaping began at approximately 2:20 o'clock that afternoon. By 3:30 p.m., defendant had admitted that he was solely responsible for the robbery and murder of Ms. Jones. The facts of this confession and interrogation will be set forth more fully below as they relate to one of the central issues on this appeal.
In summary, within approximately eight hours of the discovery of Ms. Jones' body, Gregory Montecarlo Jones was in custody and had admitted that he was the sole perpetrator of the robbery and murder. The investigation thus ended.

B.
On February 20, 1981, Gregory Montecarlo Jones, defendant below and appellant here, was formally charged with the capital murder of Josie Lincoln Jones, while he was engaged in the robbery of Ms. Jones pursuant to Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1983)[2]. Jones entered a plea of not guilty.
*690 On May 26, 1981, the case was called for trial in the Circuit Court of Harrison County, Mississippi. The trial lasted for three days. On May 29, 1981, after approximately two hours of deliberation, the jury returned a unaminous verdict that Jones was guilty as charged in the indictment.
Thereafter, on the same day, Gregory Montecarlo Jones was put to trial on the question of sentence. After deliberating approximately one and one-half hours, the jury returned its verdict that the aggravating circumstances outweighed the mitigating circumstances and that Jones should be put to death in the manner prescribed by law. From this conviction and sentence, Jones appeals.

III.
On this appeal Jones presents thirteen assignments of error. Because of the disposition we ultimately make, we find it necessary that only five be considered.
We reaffirm at the outset our commitment to heightened scrutiny on appeal in cases where the sentence of death has been imposed. Concurring in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), Justice Stewart wrote:
The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.
 408 U.S. at 306, 92 S.Ct. at 3760, 33 L.Ed.2d at 388.
This theme, the unique nature of the death penalty, has been repeated time and time again: Furman v. Georgia, 408 U.S. at 287-289, 92 S.Ct. at 2751-2752, 33 L.Ed.2d at 376-378 (Brennan, J., concurring); Gregg v. Georgia, 428 U.S. 153, 187-188, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859, 882, 883 (1976); Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976); Gardner v. Florida, 430 U.S. 349, 357-358, 97 S.Ct. 1197, 1204-05, 51 L.Ed.2d 393, 402 (1977); Coker v. Georgia, 433 U.S. 584, 598, 97 S.Ct. 2861, 2869, 53 L.Ed.2d 982, 993 (1977); Lockett v. Ohio, 438 U.S. 586, 604-605, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973, 989-990 (1978); and Beck v. Alabama, 447 U.S. 625, 638, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392, 403 (1980).
This Court has repeatedly recognized that appellate review in capital cases is different from that in other cases. Irving v. State, 361 So.2d 1360 (Miss. 1978) observes:
We recognize that thoroughness and intensity of review are heightened in cases where the death penalty has been imposed. [citation omitted] What may be harmless error in a case with less at stake becomes reversible error when the penalty is death. [citations omitted]
361 So.2d at 1363; Laney v. State, 421 So.2d 1216, 1217 (Miss. 1982), Williams v. State, 445 So.2d 798, 810-811 (Miss. 1984); Neal v. State, 451 So.2d 743, 750 (Miss. 1984); Billiot v. State, 454 So.2d 445, 455 (Miss. 1984).

IV.
A major assignment of error presented by Jones regards the exclusion for cause of potential juror, Nancy Stanford. The trial judge's action in sustaining the State's challenge for cause is assigned as error on grounds that it denied Jones his right to trial by a jury drawn from a fair and representative cross-section of the community in which the trial was held. This right, of course, is secured by the Sixth and Fourteenth Amendments to the Constitution of the United States, as well as by Article 3, § 26, of the Mississippi Constitution of 1890.
This familiar point of law begins with Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Witherspoon holds that a defendant may not constitutionally be sentenced to death by a jury from which the trial court has excluded those persons who merely possess general objections to the death penalty or conscientious *691 scruples against its use. Simply put, Witherspoon stands for the proposition that the decision whether a person should live or die must be made on scales not deliberately tipped toward death.
The Witherspoon rule has been refined in recent years. Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976), holds that exclusion of just one prospective juror in violation of Witherspoon is sufficient to vitiate a death sentence. Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), holds that a prospective juror may not be excluded for cause unless he or she is
... so irrevocably opposed to capital punishment as to frustrate the State's legitimate efforts to administer its constitutionally valid death penalty scheme.
448 U.S. at 51, 100 S.Ct. at 2529, 65 L.Ed.2d at 593.
The mere fact that a prospective juror admits that his or her verdict may be affected by the possibility of the death penalty is not a constitutionally permissible justification for sustaining a challenge for cause.
The Witherspoon rule issue is one that seems to be presented in practically every death penalty appeal we consider. See, e.g., Wilcher v. State, 455 So.2d 727, 733 (Miss. 1984); Dufour v. State, 453 So.2d 337, 341-345 (Miss. 1984); Cannaday v. State, 455 So.2d 713, 719 (Miss. 1984); Williams v. State, 445 So.2d 798, 805 (Miss. 1984); Tokman v. State, 435 So.2d 664, 667 (Miss. 1983); Evans v. State, 422 So.2d 737, 739-741 (Miss. 1982). The United States Court of Appeals for the Fifth Circuit has made helpful contribution to Witherspoon jurisprudence. See, e.g., O'Bryan v. Estelle, 714 F.2d 365 (5th Cir.1983); Williams v. Maggio, 679 F.2d 381 (5th Cir.1982); Burns v. Estelle, 592 F.2d 1297 (5th Cir.1979). We have reviewed and considered all of these cases prior to today's decision.
We are presented here with a Witherspoon question of first impression. We have before us a potential juror, Ms. Nancy Stanford, who on voir dire examination stated unequivocally that she did not believe in capital punishment and that she would not vote for the death penalty in the case at bar. Juror Stanford made it equally clear, however, that this would not affect her vote on the question of guilt or innocence.
In the context of the bifurcated trial required under our law [Miss. Code Ann. § 99-19-101 (Supp. 1983)], Juror Stanford stated unequivocally that, if she were selected as a juror to hear the guilt phase, she would be able to follow the court's instructions and a true verdict return according to the law and the evidence. Nothing in her testimony on voir dire examination in any way suggests that her verdict at the guilt phase would be affected by the possibility that at a subsequent sentencing phase trial Jones could receive the death sentence. Ms. Stanford made it equally clear, however, that if Jones were found guilty of capital murder at the guilt phase, she would not vote to return a death verdict at the sentencing phase, no matter what. Without doubt, Juror Stanford was so opposed to capital punishment that her service on the jury would have frustrated the State of Mississippi's legitimate efforts to administer its constitutionally valid death penalty scheme. Adams v. Texas, 448 U.S. 38, 51, 100 S.Ct. 2521, 2529, 65 L.Ed.2d 581, 593 (1980).
Jones insists that he was entitled to have Juror Stanford serve as a juror at the guilt phase of his trial or, at least, that she should not have been excused for cause. If that required the court to impanel a second separate jury to hear the sentencing phase, so be it.[3]
*692 This issue turns on whether the trial court may employ the same jury at the sentencing phase as heard the guilt phase consistent with the Constitution of the United States and the constitution and laws of the state of Mississippi. While the trial court is certainly free to employ a second jury if it wishes, such is not constitutionally required. Smith v. Balkcom, 660 F.2d 573, 575-584 (5th Cir.1981), cert. denied 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982). We hold that it is entirely proper under our law that the same jurors who hear the guilt phase remain and continue to serve as the jurors at the sentencing phase of a capital murder trial. Billiot v. State, 454 So.2d 445, 455 (Miss. 1984).
In cases where the same jury will hear the guilt phase and the sentencing phase, the court on voir dire examination must determine whether each prospective juror is a properly qualified juror for both phases of the trial. If a juror on voir dire states clearly that, at either phase of the trial, he or she would refuse to follow the instructions of the court and would refuse to return a true verdict according to the law and the evidence, he or she, upon timely motion, may be excused for cause consistent with the Witherspoon doctrine. We find no error in the trial court's action sustaining the state's challenge for cause against prospective juror Ms. Nancy Stanford.

V.
During voir dire examination, the district attorney was permitted to inquire of each juror individually whether he or she had any conscientious scruples against the death penalty. Defense counsel objected, urging that the prosecution was attempting to intimidate the prospective jurors. On appeal, Jones assigns as error the trial court's ruling which allowed the district attorney to conduct this individualized voir dire.
Rule 5.02 of our Uniform Criminal Rules of Circuit Court Practice provides, in pertinent part
In the voir dire examination of jurors, the attorney shall direct to the entire venire questions only on matters not inquired into by the court. Individual jurors may be examined only when proper to inquire as to answers given or for other good cause allowed by the Court.

Jones argues on this appeal that the rule requires that questions shall be directed to the entire venire only. Jones argues here that under Rule 5.02 individual voir dire examination is allowed only to inquire further regarding answers given by an individual juror in response to a question asked of the entire panel. This construction of the rule wholly ignores the language which allows individual voir dire "for other good cause allowed by the Court". Under the rule as written, it is well within the discretion of the trial judge to allow individual voir dire in a proper case. Surely a capital murder trial is one in which, under the authority of Rule 5.02, the trial judge in his discretion may allow individual voir dire. This assignment of error is denied.
It is common knowledge that defense counsel in capital murder trials regularly request individualized, sequestered voir dire in connection with the jury selection process. The conventional wisdom among defense counsel is that individualized voir dire is to the advantage of the defendant. In this context, we find it anomalous that here it is defense counsel who is objecting to individualized voir dire having been permitted the prosecution.

VI.
Jones next assigns as error that he has been prosecuted for capital murder, notwithstanding the fact that the indictment returned by the grand jury on February 20, 1981, recited § 97-3-19(1)(c) as the statute Jones' conduct was said to have violated. Because of this technical error in *693 the indictment, Jones urges in effect that he is insulated from a capital murder conviction and, more importantly, from the death penalty.
Jones invokes Miss. Code Ann. § 99-17-20 (Supp. 1983) which provides, in pertinent part, as follows:
No person shall be tried for capital murder, or for any other crime punishable by death as provided by law, unless such offense was specifically cited in the indictment returned against the accused by setting forth the section and sub-section number of the Code defining the offense alleged to have been committed by the accused ... Any conviction of the accused for an offense punishable by death shall not be valid unless the offense for which the accused is convicted shall have been set forth in the indictment by section and sub-section number of the Code which define the offense allegedly committed by the accused.
It is true that the indictment originally, and no doubt inadvertently erroneously, charged Jones with simple murder under sub-section (1)(c). The indictment, however, was labeled as one for "capital murder". It charged specifically that on the date in question Jones
Did then and there wilfully, unlawfully, feloniously and of his malice aforethought kill and murder a human being, to wit: Josie Lincoln Jones while engaged in the commission of the crime and felony of robbery, contrary to § 97-3-19(1)(c) of the Mississippi Code of 1972, Annotated, contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State of Mississippi.
Obviously, the indictment in substance charges Jones with capital murder under § 97-3-19(2)(e), not sub-section (1)(c).
As a due process proposition, Jones' point has no merit. It is clear beyond peradventure that Jones and his attorney understood well in advance of trial that the charge was capital murder and that he was in jeopardy of the possible imposition of the penalty of death. As a matter of due process, Jones was entitled to reasonable advance notice of the charges against him and to a reasonable opportunity to prepare and present his defense to those charges. These rights he enjoyed.
Beyond that, the indictment was sufficient under Rule 2.05 of our Uniform Criminal Rules of Circuit Court Practice. That rule provides as follows:
FORM OF THE INDICTMENT
The indictment upon which the defendant is to be tried shall be a plain, concise and definite written statement of the essential facts constituting the offense charged and shall fully notify the defendant of the nature and cause of the accusation against him. Formal or technical words are not necessary in an indictment, if the offense can be substantially described without them.
An indictment shall also include the following:
(1) The name of the accused;
(2) The date on which the indictment was filed in each court;
(3) A statement that the prosecution is brought in the name and by the authority of the State of Mississippi;
(4) The county and judicial district in which the indictment is brought;
(5) The date and if applicable the time, on which the offense was alleged to be committed. Failure to state the correct date shall not render the indictment insufficient;
(6) The signature of the foreman of the grand jury issuing it; and
(7) The words "against the peace and dignity of the state".
The rule has been construed reasonably and according to its tenor in Henderson v. State, 445 So.2d 1364, 1367-1368 (Miss. 1984); Joshua v. State, 445 So.2d 221, 223 (Miss. 1984); and Dalgo v. State, 435 So.2d 628, 630 (Miss. 1983). So construed, the rule mandates rejection of the present assignment of error.
We regard Rule 2.05 as authoritatively stating the formal requisites an indictment *694 must meet. This is true in all criminal cases, including capital murder cases. Rule 2.05 is well within the rulemaking power of this Court. See Newell v. State, 308 So.2d 71, 74-78 (Miss. 1975). Indeed, we have venerable precedent for the proposition that  even in capital murder cases  our rule-making power extends to all procedural matters, notwithstanding contrary or conflicting enactments of the legislature. Jackson v. State, 337 So.2d 1242, 1253 (Miss. 1976).
Our Uniform Criminal Rules of Circuit Court Practice were formally adopted August 15, 1979. The rules were in effect at the time of the return and filing of the original indictment in this cause on February 20, 1981. The sufficiency under Mississippi law of the form of that indictment, accordingly, is determined according to Rule 2.05.
Jones' reliance upon Section 99-17-20, an enactment of the Legislature of the State of Mississippi, is ultimately without merit for reasons we trust are obvious and accepted at this point in time. The form of an indictment being a matter purely procedural, it is this Court's prerogative and responsibility to adopt rules regulating the same. Rule 2.05 provides for a full and fair protection of the rights of accused. The rules fully regard the due process rights of the accused to reasonable advance notice of the charges against him. Nothing in Rule 2.05 requires that the specific section number be cited in the indictment.[4] Indeed, it would be an ultimate exaltation of form over substance to hold this indictment deficient because it did not at the outset charge under subsection (2)(e), when it is entirely clear that the indictment charges capital murder.
In short, this assignment of error is rejected.

VII.
Our next inquiry concerns the legality of Jones' arrest and original detention by Perry County officials on the evening of January 20, 1981. The issue is of importance. Jones urges here that his arrest and initial detention were illegal and that, as a result thereof, tangible evidence seized incident to that arrest as well as his subsequent inculpatory statements were rendered inadmissible. Without doubt, the evidence  admissibility of which Jones here complains  was important evidence leading to his conviction of the crime of capital murder.
On the evening of January 20, 1981, Perry County Constable Barnes found Jones slumped over the steering wheel of his truck sitting in the middle of a well-traveled highway at night. The truck engine was running, and the headlights had been turned off.[5] At that time, of course, the constable had no knowledge whatsoever of the homicide. Jones appeared to be intoxicated. The constable placed him under arrest for operating a motor vehicle under the influence of intoxicating liquors in violation of Miss. Code Ann. § 63-11-30(1)(c) (Supp. 1983).
Jones calls our attention to Miss. Code Ann. § 99-3-7 (1972) which provides as follows:
An officer or private person may arrest any person without a warrant, for an indictable offense committed, or a breach of the peace threatened or attempted in *695 his presence; or when a person has committed a felony ...
He also cites Taylor v. State, 396 So.2d 39 (Miss. 1981), wherein we held that, to effect a lawful arrest of a misdemeanant, an officer must either be present as a witness to the offense or have an arrest warrant prior to the arrest.
Constable Barnes had no warrant. And it is true that he never saw Jones driving the truck. The issue, however, is not whether Jones was in fact and in law guilty of the offense for which he was arrested but whether Constable Barnes reasonably believed that, as he observed him, Jones was committing the offense. For the arrest to have been lawful, it is not necessary that the information the officer had at the time of the arrest be sufficient to sustain a conviction of the crime charged. Michigan v. DeFillippo, 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343, 349 (1979).
The statute in question makes it a misdemeanor for any person "to drive or otherwise operate a vehicle" while intoxicated or under the influence of intoxicating liquors. Miss. Code Ann. § 63-11-30(1)(c) (Supp. 1982). One may "operate" a motor vehicle without "driving" it. Ferguson v. State, 198 Miss. 825, 828, 23 So.2d 687, 688 (1945). A person who is sitting behind the steering wheel of an automobile, in full control of the automobile, where the engine is running and the vehicle is situated on a public roadway, albeit not under way at the time, is "operating" the motor vehicle within the meaning and contemplation of Section 63-11-30(1)(c).
We hold that, given the facts recited above, the arrest of Jones by Perry County Constable Barnes based upon a misdemeanor committed in his presence was lawful. As a matter of common sense, the constable would have been derelict in the performance of his duties had he failed to arrest Jones under the circumstances existing and as known to him on the evening of January 20, 1981.
This tree not being poisonous, its fruits are not tainted.[6] The assignment of error based upon the admission of tangible evidence seized incident to the arrest and the confessions and other inculpatory statements made by Jones, insofar as they are *696 based upon the claim of an illegal arrest, are rejected.

VIII.

A.
The confessions are next challenged on grounds that they were obtained in violation of rights secured to Jones by the Fifth and Fourteenth Amendments to the Constitution of the United States. We will consider separately the confessions or the statement given to Perry County officials and subsequently those given to Biloxi officials. The two are related temporally, however.
On the morning of January 21, 1981, shortly before 10:30 a.m., Jones executed and delivered to Perry County authorities a printed form entitled "Voluntary Statement." He had also executed a printed form and checklist wherein he acknowledged his understanding that he had been vested with the various Miranda rights and that he waived them. The "Voluntary Statement" contained a handwritten version of Jones' original statement which, in the main, acknowledged complicity in the robbery but charged that another, one Freddie Hilton, did the actual killing. The confession is not in Jones' handwriting. By 11:15 a.m., Jones executed a typed version of the handwritten statement. The typed version contained certain additions not relevant here.
The mere giving of the Miranda warnings, no matter how meticulous, no matter how often repeated, does not render admissible any inculpatory statement thereafter given by the accused. The giving of the warnings is only the first step. To render the statement admissible the State must take the second step and prove that the rights of which the accused has been Miranda-warned were thereafter waived  intelligently, knowingly and voluntarily. Neal v. State, 451 So.2d 743, 753 (Miss. 1984).
A factor to be considered in determining the voluntariness of Jones' confession is that he is mildly mentally retarded. Evidence at trial established that Jones has an I.Q. level in the 60-70 range. He was in special education making D's and F's when he dropped out of school in the seventh grade. His coded age is nine or ten with a second grade educational level. In Williamson v. State, 330 So.2d 272 (Miss. 1976), we recognized that
the will of a person who is of weak intellect may be more easily overcome than that of one who is more intelligent. 330 So.2d at 276.
Still it is clear from our cases that the mental deficiencies of the accused are only one factor to be considered in determining the voluntariness of the confession. See, e.g., Ford v. State, 75 Miss. 101, 21 So. 524 (1897) (13-year-old "dull negro boy"; held the confession should have been suppressed); Hamilton v. State, 77 Miss. 675, 27 So. 606 (1900) (confession made by a dull black boy held inadmissible); Harvey v. State, 207 So.2d 108 (Miss. 1968) (defendant had I.Q. of 60 and suffered from brain disfunction; confession suppressed); Dover v. State, 227 So.2d 296 (Miss. 1969) (45-year-old defendant with I.Q. of 60 confessed; Court held confession inadmissible); Hancock v. State, 299 So.2d 188 (Miss. 1974) (dull normal man's confession admissible after Miranda warnings); Gator v. State, 402 So.2d 316 (Miss. 1981) (confession held admissible where defendant's I.Q. was placed at range between 43 and 70); see also, Neal v. State, 451 So.2d 743, 755-756 (Miss. 1984) (discussion of how intelligence relates to voluntariness); Lee v. State, 338 So.2d 399, 401 (Miss. 1976) (same); Harrison v. State, 285 So.2d 889, 890 (Miss. 1973) (same).
The test in all cases ultimately remains: after all of the Miranda warnings have been given and rights articulated therein respected, has there been under "the totality of the circumstances" a knowing and voluntary waiver of the accused's privilege against self-incrimination? Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212 (1979); Edwards v. Arizona, 451 U.S. 477, 486 n. 9, 101 S.Ct. 1880, 1885-6 n. 9, 68 L.Ed.2d *697 378, 387 n. 9 (1981); Depreo v. State, 407 So.2d 102, 106 (Miss. 1981). Until compliance with the strictures of Miranda has been shown, however, the question of voluntariness is never reached.
In connection with our evaluation of whether the trial judge applied the appropriate legal standards, we must, of course, ascertain that he applied the correct burden of proof. It is well established in this State that, where the admissibility of a confession has been put in issue, the State has the burden of proving all facts prerequisite to admissibility beyond a reasonable doubt. Neal v. State, 451 So.2d 743, 753 (Miss. 1984); Dover v. State, 227 So.2d 296, 300 (Miss. 1969); Harvey v. State, 207 So.2d 108, 115 (Miss. 1968); Stevens v. State, 228 So.2d 888, 889 (Miss. 1969).
Jones' confession was without the advice or presence of counsel. When an accused makes an in-custody inculpatory statement without the advice or presence of counsel, even though warnings and advice regarding his privilege against self-incrimination have been fully and fairly given, the State shoulders a heavy burden to show a knowing and intelligent waiver. Fare v. Michael C., 442 U.S. 707, 724, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197, 212 (1979); Miranda v. Arizona, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 724 (1966); Neal v. State, 451 So.2d 743, 753 (Miss. 1984); Abston v. State, 361 So.2d 1384, 1391 (Miss. 1978). That burden is proof beyond a reasonable doubt.
The trial court conducted an extensive inquiry into the facts and circumstances surrounding the statements made to Perry County authorities. The trial judge made both findings necessarily requisite to admissibility: (1) that Jones was fully advised of his rights and (2) that he knowingly, intelligently and voluntarily waived those rights and freely and voluntarily made the statements. Based upon our review of the record, we find these findings supported by substantial evidence and beyond our authority to disturb. The trial judge fairly and competently applied the appropriate and controlling substantive, evidentiary and procedural rules of law. The statements given by Jones to Perry County authorities were properly received into evidence and, accordingly, we reject the assignment of error challenging same.
The statements made on video tape to the Biloxi officials are another matter, which we will examine with some care.

B.
At approximately 11:30 a.m., Perry County officials met with two Biloxi investigators, Officers Payne and Moffett, on the side of the highway four or five miles from New Augusta. Jones was with them as they were searching for Freddie Hilton, the accomplice Jones had identified. The group stopped at a country store for lunch and then returned to New Augusta. Shortly after 1:00 p.m., two officers of the Biloxi police department and one Perry County officer left New Augusta with Jones in their custody en route to Hattiesburg to obtain a videotaped statement from Jones. They arrived in Hattiesburg at 1:48 p.m. and the videotaping began at 2:21 p.m.
At the outset, Jones was warned again of his privilege against self-incrimination and his various rights under the Miranda decision. He again made a free and voluntary waiver of those rights and began answering questions. For approximately 30 minutes, nothing eventful occurred. Jones was telling essentially the same story he had told before, that is, that he had accompanied Freddie Hilton and that Hilton had in fact killed Ms. Jones.
Well into the videotaping of the statement, officers began suggesting that Jones had acted alone. Undisguisedly, the officers were telling Jones that they regarded his statement about an accomplice to be a lie and that he should come clean and tell the truth. We emphasize that the interrogation here focused on the central issue of the whole case: Did Jones act alone? In this context, it is important to set forth the precise colloquy between the law enforcement officials and Jones:
*698 BY MR. PAYNE: Sonny?
BY THE DEFENDANT: Yes, sir.
BY MR. PAYNE: Tell us the truth, right now, today; let's go with it today. Okay?
BY THE DEFENDANT: All right.
BY MR. PAYNE: Now, you know, I don't, uh, believe you. I think that you was by yourself as a matter of fact, I know you were. And we've got people next door that only saw you, only saw you. Now tell us the truth, Sonny. Let's get this thing over with. There ain't no use bringing nobody else in there, if there wasn't nobody else there and you know. Let's get it straight between us, right now, today, before we walk out the door. Okay?
You, that, you're not going to be, uh, any more in trouble than you are right now because you are in trouble and you know that. You went there with the intentions to do exactly what you did. And we're going to be able to prove it. All I want is the truth. And, Sonny, I know you're not telling it because you're setting there and you are scared because you know we know. Now, I want you to tell us the truth. There wasn't anybody else there with you, was there, Sonny?
BY THE DEFENDANT: Well, uh, I prefer not to speak on that.
BY MR. MOFFETT: Say again?
BY THE DEFENDANT: I prefer not to speak on that.
BY MR. MOFFETT: You could just start at the beginning and tell us, just start at the beginning and just tell us about it. You've told us enough already that you've explained, that, you and I go out and kill somebody. What's the difference in the two of us walking in the door and I shoot 'em, I'm no more in trouble than you are.
BY MR. PAYNE: Huh?
BY THE DEFENDANT: No, sir.
BY MR. PAYNE: Do you fell like if you told us the truth that we'd mistreat you?
BY THE DEFENDANT: No, sir.
BY MR. PAYNE: Tell me?
BY THE DEFENDANT: No, sir.
BY MR. PAYNE: Now, that's right because you get no bad vibes from us. I know that it's a terrible thing, what you did. It's terrible. And I don't know, if I was in your place, whether I'd want to speak it either. You understand! Because that's terrible going in there on that old woman, who you knew, who befriended you, whose paralyzed husband is laying up there in the hospital, to go in there and rob her and attempt to rape her and kill her and steal her stuff and go. I know that's terrible. Okay? But that's what you're charged with and that's what we're going to be able to prove. But, what I want is the truth. And let's get it over with right now. The sooner you get it off of your chest, I think the better you will feel because, you know, putting it off on this other boy. He's got enough problems and you know it.
Do you want to turn that off? All right. Well, would you say, I'll turn it off but all I ask you is to tell the machine, uh, in other words, if you want it off, I'll turn it off.
BY THE DEFENDANT: I have somethin' to ask you.
BY MR. PAYNE: Do you want ____
BY THE DEFENDANT: (Interposing) Yes, sir.
BY MR. MOFFETT: Do you want us to turn the tape off?
BY THE DEFENDANT: Yeah, I have somethin' to ask you.
BY MR. PAYNE: Okay. You don't want it on tape what you want to ask me?
BY THE DEFENDANT: No.
BY MR. PAYNE: All right. You, uh, here, wait a minute, oh, excuse me. It's now ten minutes after three. Press that STOP button, if you want it off.
(Tape was then turned off.)
BY MR. PAYNE: All right. Now, it is three sixteen.
*699 (THE TRANSCRIPT OF THE VIDEO TAPE AND THE TAPE RECORDER ENDS TEMPORARILY HERE:)
BY THE COURT: It was off for six minutes; is that correct?
BY MR. PAYNE: Yes, sir.
[Emphasis Added].
After this "gap" in the tape, officers again put to Jones the question whether he had acted alone. Visibly upset and shaken, Jones admitted that his previous story had been a fabrication and that he had indeed acted alone in robbing and killing Ms. Jones.
Critical here is Jones' statement that he did not want to answer questions with reference to whether he had acted alone. Twice, unequivocally, Jones said "I prefer not to speak on that." There is little ambiguity about Jones' words. Considering his mental abilities and education level, Jones stated quite clearly that he did not wish to answer questions on the subject of whether he acted alone.[7]

C.
Under established constitutional jurisprudence an accused undergoing interrogation while in custody has the right at any time in any manner to have the interrogation terminated or limited. This right was originally articulated by the Supreme Court in Miranda v. Arizona where the Supreme Court stated:
"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." 384 U.S. at 473-474, 86 S.Ct. at 1627-1628, 16 L.Ed.2d at 723. [Emphasis added]
The Supreme Court has subsequently held that the accused's right to cut off questioning must be "scrupulously honored". Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975).
We have recognized and enforced this branch of Miranda without quibble: In the Interest of Wilder, 347 So.2d 520, 521 (Miss. 1977); McDougle v. State, 355 So.2d 1386, 1388-1389 (Miss. 1978); Murphy v. State, 426 So.2d 786, 789-790 (Miss. 1983); Bell v. State, 443 So.2d 16, 21 (Miss. 1983); Neal v. State, 451 So.2d 743, 755 (Miss. 1984).
The contours of the rule are:

1.
No magic language must be used by an accused wishing to invoke his right to stop the interrogation. Miranda uses the phrase "in any manner at any time." 384 U.S. at 474, 86 S.Ct. at 1627, 16 L.Ed.2d at 723. Justice Roy Noble Lee italicizes and thus adds emphasis to those words in Murphy. 426 So.2d at 789. In Wilder, Justice Roy Noble Lee merely uses the phrase "in some way".
"If the accused indicates in some way that he wishes questioning to cease, the interrogation must end." 347 So.2d at 521.
Gregory Montecarlo Jones' words "I prefer not to speak on that" are, in my view, clearly "any manner" or "in some way" within the meaning of the cases.

2.
Limited invocations of the right to stop questioning are also recognized. One under interrogation may indicate a wish not to speak on a particular topic, thus foreclosing further questioning on that topic but leaving the interrogators free to explore *700 other unrelated areas. Michigan v. Mosley finds the right not to speak properly invoked as to questioning regarding an armed robbery. This, however, did not taint a confession emanating from further interrogation (after a two-hour cooling-off period and after new Miranda warnings were given) regarding a homicide unrelated to the robbery. This nuance of the rule has been well put by Judge Charles Clark in United States v. Vasquez, 476 F.2d 730 (5th Cir.1973), to wit:
"When a person in custody has responded to proper police interrogation by voicing a general willingness to talk, subject only to a limited desire for silence, and his wishes not to discuss a particular subject-matter area are respected, nothing rooted in law or constitutional policy makes it improper to question him as to any unlimited subjects.[2]"
"[2] We certainly do not intimate approval of any practice by which a suspect's express desire to remain silent as to some specific activity is aborted by the subterfuge of questioning which is designed or intended to indirectly gain information about those matters which he has indicated he wishes not to discuss." [Emphasis added] 476 F.2d at 732-733.
Gregory Montecarlo Jones' statement "I prefer not to speak on that" carries a reasonable construction that he preferred not to speak on the particular subject matter then under discussion, to wit: the question of whether Jones acted alone in connection with the homicide of Josie Lincoln Jones. The language used by Jones could not fairly be considered a blanket invocation of his right to remain silent but rather a limited one, recognized as one that must be scrupulously honored by Michigan v. Mosley.

3.
Once the suspect invokes his right to terminate questioning, in whole or in part, the interrogation must cease. Before the interrogation may resume, it is generally required that three things happen. First, there must be a cooling-off period. The officers must allow some time to go by before the questioning is resumed. Two hours were sufficient in Michigan v. Mosley. Overnight was sufficient in Neal v. State. Second, there must be a reasonable basis for inferring that a suspect has voluntarily changed his mind. McDougle v. State, 355 So.2d at 1388; Murphy v. State, 426 So.2d at 789. Third, new and adequate Miranda warnings must be given. McDougle v. State, 355 So.2d at 1388; Murphy v. State, 426 So.2d at 789.
The cases do not set down a hard and fast rule. Research reveals no case, however, where the confession was held admissible absent either a cooling-off period or new and adequate warnings. Conversely, practically every case where there was a cooling-off period and new and adequate warnings were given has resulted in the subsequent confession being held admissible.

4.
We are dealing here with what is substantially a factual inquiry. We have numerous cases which hold that where custodial interrogation proceeds in the absence of counsel and yields a statement, the prosecution bears a "heavy burden" to demonstrate that the suspect's constitutional rights have been respected. McDougle v. State, 355 So.2d at 1388. All of this has been explained in subsection VIII(A) above. On the other hand, our law is established that findings of fact made by the trial judge at a suppression hearing will be accorded the same respect as findings of fact made by a trial judge sitting without a jury in any other context. Neal v. State, 451 So.2d at 753.
In this case the trial judge's ruling on the admissibility of the confessions does not deal with the precise point in issue. [Vol. IV, R. 521-522] Accordingly, Jones is not swimming upstream against a finding of fact. Moreover, because of the fact that the interrogation in relevant part was video-tape recorded, the facts are uncontradicted. Even if there were a finding of fact on the issue in question, that finding would have to be held clearly erroneous.

*701 D.
In summary, under the above authorities,[8] Jones effectively invoked his right to remain silent. Considering his general intelligence and education level, his statement "I prefer not to speak on that" would seem as positive as he was capable of making. From their testimony, there is obviously no doubt in the minds of Officers Payne and Moffett that Jones was invoking his constitutional privilege against further self-incrimination.
The transcript of the "interview" reveals that, after Jones said for the second time "I prefer not to speak on that", the officers carefully and subtlely sought to change his mind. This they simply may not do. Any inculpatory statements made by Jones after he said for the second time, "I prefer not to speak on that" must be held to have been unlawfully obtained. Miranda's requirement that Jones' request that he not be interrogated on the subject of whether he acted alone was not scrupulously honored. For this reason, we never reach the question whether under the totality of the circumstances he re-waived his rights.

E.
The statements elicited from Jones after he had invoked his privilege against further self-incrimination were significantly different from what he had been saying before, though nothing really turns on the point. Before, Jones had admitted involvement in the crime but had insisted that an accomplice, Freddie Hilton, had been the principal actor. Afterwards, Jones admitted that he had acted alone. Jones was, as a practical matter, in far greater jeopardy if he perpetrated the crime alone.
Beyond that, if Hilton had actually done the killing, there would be a substantial doubt whether the State could have proved Jones' intent sufficient to obtain a death sentence consistent with Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In Enmund the Supreme Court held that the death penalty may not be imposed in absence of proof that the defendant killed, attempted to kill, or intended to kill. Suffice it to say that there is little in Jones' "before" statement that could be construed to indicate that he had killed, attempted to kill, or intended to kill. See Jones v. Thigpen, 741 F.2d 805 (5th Cir.1984).
We hold that all of the statements made by Jones to the Biloxi law enforcement officials on January 21, 1981, after Jones said "I prefer not to speak on that" were unlawfully secured. Such is the inescapable command of Miranda and its progeny. Because the statements made after Jones invoked his Miranda rights were qualitatively more incriminating than the "before" statements, we hold the "error" harmful. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710-11 (1967); Schneble v. Florida, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340, 345 (1972); Connecticut v. Johnson, 460 U.S. 73, 81-90, 103 S.Ct. 969, 74 L.Ed.2d 823, 831-836 (1983).

F.
One final point must be considered. At the guilt phase of his trial, after all confessions had, over his objection, been presented to the jury, Jones took the stand in his own defense. There he testified to the same general course of events contained in the confession we have above held inadmissible. By so doing Jones has, we are told, waived the point.
We reject the waive argument. When accepted rules of law and considerations of common sense fairness are brought to bear, it may be seen that on these facts we have no authority to hold that Jones has been guilty of a waiver.
Consider the case at the point where the trial judge finally overruled Jones' motion to suppress his confessions (including the *702 videotaped confession which we today hold to have been unlawfully obtained). At that point, general notions familiar to all come into play. When the trial judge has ruled on a point and a litigant's lawyer has properly noted his objection, that litigant and his lawyer are entitled to try the rest of the case on the assumption that the trial judge's ruling will not be disturbed on appeal. When that litigant reaches this Court we will not imply a waiver from subsequent conduct which does nothing more than show the lawyer's obligatory respect for the trial judge while at the same time continuing as best can be done the advancement of his client's cause.
This general point of practical fairness has recently been reaffirmed by this Court in Stong v. Freeman Truck Line, Inc., 456 So.2d 698, 711 (Miss. 1984). It has been a part of our law and practice in both civil and criminal cases for years. In civil cases, for example, where a party requests a correct instruction only to have it refused by the trial judge, that party does not, by requesting another instruction bowing to the trial judge's ruling, waive the right to assign as error on appeal the refusal of the correct instruction. Home Insurance Company of New York v. Dahmer, 167 Miss. 893, 901, 150 So. 650, 652 (1933); Foster v. City of Meridian, 150 Miss. 715, 728, 116 So. 820, 823 (1928).
In the Foster case, this Court said:
"Appellant had done all she could to keep this question from the jury... . She had objected to the evidence offered by the Appellee ..., which objection had been, by the Court, overruled, ... . Appellant then yielded, as she had to, to the ruling of the Court, and embodied in some of her instructions given by Court the principle to which she had so strenuously objected. We know of no authority which holds that in so doing she lost her rights."
150 Miss. at 728, 116 So. at 823.
The analogy to the case at bar is apparent. Jones' attorney objected strenously to the admission of the confession. Once his objections had been overruled, however, and the confessions had been presented to the jury, he had no alternative but to present his defense in such a way as would minimize the impact of the confession.
The same point was made in Home Insurance Company of New York v. Dahmer when the Court stated:
"Appellees urge that Appellant is estopped from attacking the validity of the ordinance admitted in evidence over its objection, because it obtained an instruction assuming that the ordinance was properly in evidence. We think that view is without merit. If a cause is erroneously tried over the objection of one of the parties, such a party by yielding and making the best of the situation waives no right on appeal."
167 Miss. at 901, 150 So. at 652.
The same considerations of practical fairness have come to be accepted in our criminal practice as well, albeit more grudgingly. In Keys v. State, 283 So.2d 919 (Miss. 1973), this Court held that a defendant in a drug possession case
"did not waive his objection to the illegally obtained testimony by testifying in his own behalf, although he admitted having the contraband in his possession."
283 So.2d at 927.
Thereafter, in Hughes v. State, 376 So.2d 1349 (Miss. 1979), this Court reiterated the rule.
"It should be noted that an accused by becoming a witness at trial does not ipso facto waive his previous objection to the introduction of an out-of-court custodial admission. If the out-of-court admission was erroneously admitted, that error would be compounded by placing undue influence upon the accused to testify, thereby eroding the voluntariness of his testimony. Keys v. State, 283 So.2d 919, 927 (Miss. 1973); People v. Spencer, 66 Cal.2d 158, 164, 57 Cal. Rptr. 163, 169, 424 P.2d 715, 719 (1967). Cf. Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) (sworn testimony from previous trial held inadmissible in latter trial where testimony at previous trial was motivated by prior introduction *703 of illegally obtained confession)."
376 So.2d at 1351.
The practical reasonableness of the above-described approach to trial and appellate practice, in both civil and criminal cases, seems so clear that it is hard to understand how or why it might be questioned. When the trial judge has made a ruling  be it on an evidentiary question, a proposed jury instruction or whatever  we must allow the party losing the point to "accept" the trial judge's ruling and "make the best of the situation" without fear of waiving the point on appeal. Otherwise, we place upon such party a grim choice: if he "accepts" the trial judge's ruling and then goes ahead and tries the remainder of his case as best he can considering the adverse circumstances with which he is then confronted, he would on the majority's view face a near certain holding in this Court of waiver (translate "AFFIRMED"). On the other hand, if he plays it safe and refuses to do anything from which the Court might imply a waiver, he even further reduces his chances of a favorable verdict at trial and runs the substantial risk that, for whatever reason, this Court on appeal might be of the view that the trial judge's ruling was correct (translate "AFFIRMED"). In this latter event, the party may well have, for fear of a waiver being implied, forborne to go forward with evidence which might have disposed the jury more favorably toward him. Considerations of practical reasonableness condemn as intolerable subjecting a party to such a Hobson's choice.
All of this aside, however, any notion that a waiver ought to be found here is in law proscribed by the authoritative construction of the Constitution of the United States in Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968). Harrison may be distilled into two rules:
(1) [If a defendant takes the stand and testifies] "in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible".
392 U.S. at 223, 88 S.Ct. at 2010, 20 L.Ed.2d at 1052.
(2) "Having `released the spring' by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony."
392 U.S. at 225, 88 S.Ct. at 2011, 20 L.Ed.2d at 1053.
Harrison thus squarely holds that the State has the burden of showing that the defendant's testimony from the witness stand was not the proximate result of the trial judge's erroneous evidentiary ruling allowing the videotaped confession to be presented to the jury. Suffice it to say that the State made no attempt to carry this burden.
Nowhere in Harrison is there the slightest indication that the rule enunciated should vary depending upon whether the testimony given in response to improperly-admitted evidence was inculpatory or exculpatory. At his trial, in response to the illegally-obtained evidence, Harrison testified and admitted that he had done the killing but claimed it was an accident. 392 U.S. at 221, 88 S.Ct. at 2009, 20 L.Ed.2d at 1050; Harrison v. United States, 387 F.2d 203, 210 (D.C. Cir.1967). Gregory Montecarlo Jones, in his response to the improperly admitted evidence, admitted that he had done the killing but claimed that he was insane at the time. Both Harrison's and Jones' statements were part inculpatory and part exculpatory. One could argue perhaps that Harrison's testimony was "more" exculpatory but such a distinction is too vague to be useful.
Moreover, we find no case emanating from the United States Court of Appeals for the Fifth Circuit which gives any comfort to the waiver argument advanced here. The Fifth Circuit recognizes a blanket rule that:
"Where a defendant takes the stand to overcome the impact of the testimony that has been illegally obtained, the trial *704 testimony itself becomes tainted by the illegally obtained statements." [citation to Harrison] [emphasis added]

United States v. Ledezma-Hernandez, 729 F.2d 310, 313 (5th Cir.1984); United States v. Downing, 665 F.2d 404, 409 (1st Cir.1981) (confession induced by illegal evidence must be suppressed, citation to Harrison); Smith v. Estelle, 527 F.2d 430, 433 (5th Cir.1976) (if defendant took stand "in order to overcome the impact of confessions illegally obtained" then testimony was tainted, citation to Harrison); Randall v. Estelle, 492 F.2d 118, 120 (5th Cir.1974) (after admission of illegal evidence defendant took the stand and "immediately admitted responsibility for the homicide but protested that the deed was done with no `malice'"  Harrison mandated vacation of sentence.)
The waiver argument and the attempt on the facts of this case to distinguish Harrison simply won't wash. There is no need for eloquence, no need for policy discussion, no need for hyperbole  it is not the law.

IX.
Upon retrial, of course, the "before" portions of the statement to Biloxi law enforcement officials may be received into evidence, provided they are not presented in such a way that the jury is left with the impression that something is being held back, that they are not hearing everything Jones said. In addition, the statements given Perry County officials are admissible on retrial.
For the reasons set forth above, the judgment of conviction of Gregory Montecarlo Jones for the offense of capital murder is vacated, together with the sentence of death heretofore imposed in connection therewith.
This case is remanded to the Circuit Court of Harrison County, Mississippi, for a new trial not inconsistent with this opinion.
REVERSED AND REMANDED.
PATTERSON, C.J., and DAN M. LEE, PRATHER and SULLIVAN, JJ., concur.
HAWKINS, J., concurs in part and dissents in part.
ROY NOBLE LEE, P.J., and BOWLING, J., join in guilt phase only.
WALKER and ROY NOBLE LEE, P.JJ., and BOWLING, J., dissent.
WALKER, Presiding Justice, dissenting:
I respectfully dissent because I sincerely feel that justice has been thwarted. I am of the opinion that any error relating to the introduction of the video-taped confession on which the majority reverses this case was cured when appellant took the stand at the sentencing phase of the bifurcated trial and testified in great detail precisely to the same chain of events that he had earlier related to the officers from Harrison County on the video tape. He did not vary his story to justify what happened, such as being in self-defense, accident or that someone other than himself inflicted the fatal wounds. His defense was insanity.
After testifying that he had drunk beer that afternoon, taken several black mollies (a drug) and drank some whiskey, he related the details of killing Miss Josie Lincoln Jones. The sixty-two year old lady had befriended him and given him a place to stay. His testimony, in pertinent part, is as follows:
Q. All right. Tell us what you did after you went back home.
A. Well, I went back and I went around the back there, and got the gun. And brought it back around to the front, front of the house. I took it in the room as you go in the front door, and laid it up by the organ. And I went in there and sat down.
Q. And you went in where?
A. In the living room.
Q. Who was there?
A. Miss Josie, she was there.
Q. What was she doing?
A. She was sittin' down, watchin' television. And she asked me, you know, made *705 it back; and she asked me was I hungry. I told her no, I wasn't hungry.
Q. Had you eaten anything all day?
A. No, sir, I didn't have any appetite.
Q. All right. And then what else'd y'all talk about?
A. Well, I was doin' most the talkin'. I told her that I was gonna go home, go up to momma's. And she say after everything  . No, she say after King went in the hospital, and you been around here with me, you gonna leave me all by myself. I told her I had to go see momma. And she said after all I did for you, you gonna leave me here, and so on, so on. I can't recall everything she said.
Q. There was not the first argument you'd had about this, that you'd had one the night before, right?
A. Yes, sir.
Q. So then what'd you do?
A. I just got  I just got up, went back in the front room, that little room in there. And the gun already was loaded. I just got it, and just come back in there and shot her.
Q. Okay. Where did you shoot her the first time?
A. In the head.
Q. What part of the head?
A. Up by the temple.
Q. Then did you shoot her again after that?
A. Yes, sir. I reloaded the gun, and shot again in the back. And I reloaded again, and shot again, also in the back.
Q. So you shot her three times?
A. Yes, sir.
Q. Now, how did  . What happened? After you shot her the first time, what happened to her?
A. She fell on the floor the first time.
Q. And then you walked over toward her?
A. I walked  I walked directly up on her, and unloaded it, and put another one in, and shot her. Just kept  kept unloadin' it.
Q. Did you intend to kill her?
A. No, I didn't. I didn't intend to kill her, `cause she was nice to me, and we got along good, and  .
Q. You intended to shoot her, though, didn't you, Greg?
A. Sir?
Q. Did you intend to shoot her?
A. I didn't intend to shoot her. Not  . I don't know. It wasn't my intention to shoot her, but the way it was 
Q. Why?
A. Sir?
Q. Why did you shoot her?
A. Well, I just  . I don't know. I just  just something exploded. We got to arguin' there, and she just started arguin', and looked like she just holdin' me back, and didn't want me to leave, or somethin'. So I knowed I was goin' leave. Say, well, people leavin' me here by myself, and Mr. Kingston in the hospital, and she can't get around hardly. I just  I went on and shot her.
Q. Did you think it was wrong to shoot her at that time?
A. No, not at the time. I thought I was  . At the time I guess I thought I was helpin' her.
Q. What did you do after you had shot her?
A. After I shot her? Well, I put  I put the gun down, and I walked over to her, and I pulled off her clothes, and  .
Q. Pulled off her underclothes?
A. Pants and underclothes; but I didn't have  I didn't have any sex with her.
Q. Did you think about it?
A. Well, at the time, I thought about it; but I  I checked her and seen  I seen she was dead.
Q. All right. How could you tell she was dead?
A. She  she wasn't breathin'.
Q. Then what'd you do, Greg?
*706 A. Well, I reached down  well, I cut off the television. I cut the heater off. She was right by the heater. I cut it off. I started  I started out the door, but I seen  . I done did this, so I  I just went in the room and  . Well, I didn't go in the room at first, I stayed in the front room and started grabbin' up things. And went in her room and picked up some more things.
Q. Were you lookin' for money when you went back to her bedroom?
A. No, sir, she didn't keep her money in the bedroom.
Q. Where'd she keep it?
A. She kept it on her.
Q. Did you know that? That she had the money on her?
A. I know it, yes, sir.
Q. But you did take things?
A. Yes, sir.
Q. You knew that didn't belong to you?
A. Right.
Q. All right. What about the telephone?
A. Well, the telephone rung whilst I was takin' things. And I went in there, and picked it up, and just laid it down on the side of the table there. And went back to doin' what I was doin'. And I got through and put the stuff in suitcases, and walked out the door, and locked the door.
... .
The question presented is "assuming a confession is obtained in violation of Miranda, does the defendant waive his right to raise the point on appeal when he takes the stand in his own behalf and testifies basically to the same facts related in his confession? The answer is yes for reasons discussed later in this opinion.
The leading case on this question is Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) which, in my opinion, is readily distinguishable from the case now before us.
In Harrison, the petitioner was brought to trial before a jury in the District of Columbia upon a charge of felony murder. At that trial the prosecution introduced three confessions allegedly made by the petitioner while he was in the custody of the police. After these confessions had been admitted into evidence, the petitioner took the witness stand and testified to his own version of the events leading to the victim's death. The jury found the petitioner guilty, but the Court of Appeals reversed his conviction, holding that the petitioner's confessions had been illegally obtained and were therefore inadmissible in evidence against him.
The substance of the confessions was that the petitioner and two others, armed with a shotgun, had gone to the victim's house intending to rob him, and that the victim had been killed while resisting their entry into his home. However, in his testimony at trial the petitioner testified that he and his companions had gone to the victim's home hoping to pawn the shotgun, and that the victim was accidentally killed while the petitioner was presenting the gun to him for inspection.
Upon remand, the case again came to trial before a jury. This time the prosecutor did not, of course, offer the alleged confessions in evidence. But he did read to the jury the petitioner's testimony at the prior trial  testimony which placed the petitioner, shotgun in hand, at the scene of the killing. The testimony was read over the objection of defense counsel, who argued that the petitioner had been induced to testify at the former trial in order to give his version of the killing only because of the introduction against him of the inadmissible confessions. The petitioner was again convicted, and the Court of Appeals affirmed. The United States Supreme Court granted certiorari to decide whether the petitioner's trial testimony was the inadmissible fruit of the illegally procured confessions and therefore inadmissible.
In Harrison, it was said:
In this case we need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who *707 chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him.
Here, however, the petitioner testified only after the Government had illegally introduced into evidence three confessions, all wrongfully obtained, and the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby  the fruit of the poisonous tree, to invoke a time-worn metaphor. For the "essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.' Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 321 (1920).
In concluding that the petitioner's prior testimony could be used against him without regard to the confessions that had been introduced in evidence before he testified, the Court of Appeals relied on the fact that the petitioner had "made a conscious tactical decision to seek acquittal by taking the stand after [his] in-custody statements had been let in * * *." But that observation is beside the point. The question is not whether the petitioner made a knowing decision to testify, but why. If he did so in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible. As Justice Tobriner wrote for the Supreme Court of California,
"If the improper use of [a] defendant's extrajudicial confession impelled his testimonial admission of guilt, * * we could not, in order to shield the resulting conviction from reversal, separate what he told the jury on the witness stand from that he confessed to the police during interrogation."
The remaining question is whether the petitioner's trial testimony was in fact impelled by the prosecution's wrongful use of his illegally obtained confessions. It is, of course, difficult to unravel the many considerations that might have led the petitioner to take the witness stand at his former trial. But having illegally placed his confessions before the jury, the Government can hardly demand a demonstration by the petitioner that he would not have testified as he did if his inadmissible confessions had not been used. "The springs of conduct are subtle and varied," Mr. Justice Cardozo once observed. "One who meddles with them must not insist upon too nice a measure of proof that the spring which he released was effective to the exclusion of all others." Having "released the spring" by using the petitioner's unlawfully obtained confessions against him, the Government must show that its illegal action did not induce his testimony.
No such showing has been made here. In his opening statement to the jury, defense counsel announced that the petitioner would not testify in his own behalf. Only after his confessions had been admitted in evidence did he take the stand. It thus appears that, but for the use of his confessions, the petitioner might not have testified at all. But even if the petitioner would have decided to testify whether or not his confessions had been used, it does not follow that he would have admitted being at the scene of the crime and holding the gun when the fatal shot was fired. On the contrary, the more natural inference is that no testimonial admission so damaging would have been made if the prosecutor had not already spread the petitioner's confessions before the jury. That is an inference the Government has not dispelled.
It has not been demonstrated, therefore, that the petitioner's testimony was obtained "by means sufficiently distinguishable" *708 from the underlying illegality "to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963). Accordingly, the judgment must be reversed.
392 U.S. at 222-26, 88 S.Ct. at 2010-12.
Justices Black, Harlan and White dissented. Justice Black wrote:
It seems to me that the Court in this case carries the Court-made doctrine of excluding evidence that is "fruit of the poisonous tree" to a wholly illogical and completely unreasonable extent. For this and many of the reasons suggested by my Brother WHITE'S dissent, I agree that holdings like this make it far more difficult to protect society "against those who have made it impossible to live today in safety." I would affirm this conviction.
392 U.S. at 226, 88 S.Ct. at 2012.
In his dissent, Justice Harlan said:
Like my Brother BLACK and my Brother WHITE, I am unable to understand why the Court reverses this petitioner's conviction. There is no suggestion that the testimony in question, given on the stand with the advice of counsel, was somehow unreliable. Nor, as the opinion of Mr. Justice WHITE amply demonstrates, is there any plausible argument that a rule excluding such evidence from use at a later trial adds an ounce of deterrence against police violation of the Mallory rule.
392 U.S. at 226-27, 88 S.Ct. at 2012-13.
Mr. Justice White, dissenting wrote:
This case and others like it would be more comprehensible if they purported to make procedures for trying criminals more reliable for finding facts and minimizing mistakes. * * *
Even if it were true that the rule adopted by the Court served some minimal deterrent function, I would not be able to join the Court. Marginal considerations such as these, especially when one is dealing with confessions excludable because of violation of the technical requirements of cases like Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), are insufficient to override the interest in presenting all evidence which is relevant and probative. When one adds the fact that in this case, as in most others where the issue will now arise, the defendant took the stand only upon advice of counsel, the argument for deterrence seems virtually to vanish altogether. * * *
The Court compounds its substantive error today by the procedural ploy of switching the burden of proof to the prosecution. It rules that once it is shown that the defendant testified after inadmissible confessions were used, "the Government must show that its illegal action did not induce his testimony." This despite the fact that the only person with actual knowledge of the subtle and varied "springs of conduct" which caused the defendant to take the stand is the defendant himself. This despite the fact that only five years ago this Court clearly affirmed the traditional rule that the defendant bears the burden of showing that the evidence complained of was an inadmissible fruit of illegality. Fahy v. Connecticut, 375 U.S. 85, 91, 84 S.Ct. 229, 232, 11 L.Ed.2d 171, 175 (1963). See Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307, 311 (1939). The switch in the burden can be justified only by the Court's misguided desire to exclude important evidence for which it has somehow acquired a constitutional distaste. Because I reject the end which the Court seeks to serve, I cannot endorse this naked manipulation of means to achieve that end.
Given the Court's current ideology about confessions, there is perhaps some logic on the side of the Court. But common sense and policy are squarely opposed. The important human values will *709 not be served by the obstacles which the Court now places in the path of policeman, prosecutor, and trial judge alike. Criminal trials will simply become less effective in protecting society against those who have made it impossible to live today in safety.
392 U.S. at 228-35, 88 S.Ct. at 2013-17.
It can not be logically argued under the facts of this case that the appellant was compelled, impelled or induced to take the stand because of the introduction of the illegally obtained confessions. His account of killing Miss Josie was in evidence by the confession, and his in-court testimony neither added to nor detracted from that confession in any material aspect. Consequently, there was no compelling reason for him to take the stand insofar as his account of the crime was concerned.
Therefore, when he voluntarily took the stand, with his attorney present, and testified to the same facts which he related to his unlawfully obtained extra-judicial confession, he waived any objection that he might have had to the confession. To hold otherwise defies reason and logic and amounts to an absurdity.
Where, as here, when a defendant, who is represented by counsel testifies in his own behalf, we presume that he did so voluntarily and with full knowledge of his rights.
The facts of this case distinguish it from Harrison, wherein the defendant related a different story on the witness stand than he had given in his illegally obtained extrajudicial confession.[1] In this case the story was the same  Jones shot "Miss Josie" three times with a single shot rifle, reloading after the first and second shots; took her undergarments off with the thought of raping her, but changed his mind; and then robbed her of personal belongings and fled in her pickup truck.
The appellant's defense was insanity which was rejected by the jury.
In my opinion, the jury had before it the most dependable and relevant testimony imaginable  Jones' own incriminating account of the killing, made voluntarily, under oath, with his attorney present, in open court, and, which confirmed the accuracy of his prior extra judicial video-taped confession.
The exclusionary rule applicable to illegally obtained evidence serves a useful purpose when properly applied. However, in a case such as this, the only purpose served is to permit Jones to take the stand, confess to the callous and unnecessary killing of Miss Josie, while simultaneously `thumbing his nose' at the judicial system and saying "there is nothing that you can do about it." Our system of justice is not so inflexible that it requires the stretching of a rule of law ad nauseam. Cessante Ratione Legis Cessat Ipsa Lex  Reason is the soul of law, and when the reason of any particular law ceases, so does the law itself.
If ever there were a case where the evidence warranted the jury finding that the defendant should suffer the penalty of death, this one fully meets the requirements. I would affirm the verdict of the jury and judgment of the lower court that the appellant should suffer execution for *710 his heinous and unreasonable killing of Miss Josie.
ROY NOBLE LEE, P.J., and BOWLING J., join this dissent.
HAWKINS, Justice, concurring in part and dissenting in part

GUILT PHASE
I concur in the affirmance of this case on the guilt phase.
I am of the view that the trial court properly admitted the confession into evidence.
A study of the cases cited in the majority opinion does not lead me to conclude that the portion of Jones' confession that he acted alone is inadmissible. Miranda, rather than viewing a "totality of the circumstances" in determining the admissibility of a confession, set certain specific guidelines. I fail to see that any such standard was breached. To the contrary, all were complied with.
Nor, if there is any such thing, should we hold the "spirit" of Miranda was violated from the ambiguous statement from Jones, "I prefer not to speak on that." Did he express an intent to remain silent, or simply a dread to talk about this particular aspect of the crime?
I readily agree it would have been preferable for the law enforcement officers to have removed any cloud whatsoever on the matter. Yet, I cannot conclude this in and of itself constitutes a violation of some Miranda standard.
An uncoerced confession is a vital tool to effective law enforcement, in which society has a profound, legitimate concern. We should be very careful not to corrode this weapon, which the majority is doing here by stretching the requirements of Miranda and subsequent cases. Miranda just does not require or justify the majority taking out of context the statement by appellant, when asked about only one feature of the investigation, that he "preferred not to speak" on that one question.
In my view there was no reversible error committed in the admission of the confession, and I believe that the case should be affirmed on this issue.

SENTENCING PHASE
Jones has an I.Q. in the range of 60-70. He is either an imbecile or an extremely low level moron. Consistent with my views in Edwards v. State, 441 So.2d 84, pp. 93-94 (Miss. 1983), and Neal v. State, 451 So.2d 743, pp. 764-765 (Miss. 1984), and as authorized under Miss. Code Ann. § 99-19-105 (Supp. 1982), I would set the death sentence aside and remand for modification of the sentence to imprisonment for life.
ROY NOBLE LEE, P.J., and BOWLING, J., join the guilt phase only of this opinion.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966).
[2] The indictment originally  and obviously inadvertently  cited Section 97-3-19(1)(c), the simple murder statute, although otherwise the indictment clearly charged capital murder. Before the case went to the jury, the indictment was amended to cite the correct statute.
[3] The argument is made in the context of the familiar theory that jurors who favor the death penalty generally tend to be more likely to convict. It is suggested that pro-capital punishment jurors will return a verdict of guilty in a capital murder trial on the basis of less convincing evidence than jurors having doubts about the death penalty. Because of this arguably accepted psychological profile of the pro-capital punishment juror, the defense argues that exclusion of jurors such as Ms. Stanford tipped the scales at the guilt phase toward a verdict of guilt and, thus, denied to the defendant his right to trial at the guilt phase by a fair and impartial jury. The suggestion that this psychological thesis has legal significance has been repeatedly rejected. Spinkellink v. Wainwright, 578 F.2d 582, 594 (5th Cir.1978); Smith v. Balkcom, 660 F.2d 573, 578 (5th Cir.1981).
[4] In other contexts we have held that the inclusion of the precise statutory reference in a criminal indictment is not a sine qua non of a legally sufficient indictment. Dalgo v. State, 435 So.2d 628, 630 (Miss. 1983); Osborne v. State, 404 So.2d 545, 547-548 (Miss. 1981).
[5] At a suppression hearing before the trial court, Jones disputed the accuracy of some of the facts related by Constable Barnes. The trial judge resolved those factual disputes and made findings consistent with what we have outlined above. Because we encounter this problem so often, we remind one and all that our scope of review of fact findings made at a suppression hearing is limited. Where those findings are supported by substantial credible evidence, we will not disturb them even though there be in the record evidence to the contrary. To facilitate our consideration of these matters, we urge the trial judges to provide us with such findings of fact as may be appropriate under the circumstances. Hall v. State, 427 So.2d 957, 960 (Miss. 1983).
[6] If Jones had not challenged the admissibility of tangible fruits of a search conducted incident to his arrest, we would have considered the admissibility of the confessions vis-a-vis the alleged illegal arrest under the pattern of analysis set forth in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and in our recent decision in Hall v. State, 427 So.2d 957, 958-61 (Miss. 1983). In Hall, we recognized that many confessions and other inculpatory statements may be sufficiently remote from the arrest of the accused so that the illegality of the arrest, if there be such, should not render inadmissible the accused's statements. As we stated in Hall:

The mere fact that a defendant confesses while in custody following an illegal arrest does not per se render the confession inadmissible. Rather, Brown holds that
[t]he question whether confession is the product of a free will under Wong Sun must be answered on the facts of each case. No single fact is dispositive. 422 U.S. at 603, 95 S.Ct. at 2261, 45 L.Ed.2d at 427.
Brown then goes on to set forth the factors that ought to be considered by the trial court when faced with such a situation. First, Brown recognizes that
[t]he Miranda warnings are an important factor to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. 422 U.S. at 603, 95 S.Ct. at 2261, 45 L.Ed.2d at 427.
Other Brown factors which ought to be considered are
(1) the temporal proximity of the arrest and the confession;
(2) the presence of intervening circumstances
(3) the purpose and flagrancy of the official conduct, i.e., the making of the illegal arrest; and
(4) any other circumstances that seem relevant.
427 So.2d at 959-60; Neal v. State, 451 So.2d 743, 759 (Miss. 1984); Lanier v. State, 450 So.2d 69, 74-75 (Miss. 1984).
When we apply here the factors approved in Hall, we again conclude that the defendant's statements are admissible  with the exception noted below wherein other grounds are implicated. The Miranda warnings given Jones were certainly adequate. As we have found above, there was no illegal or questionable purpose in the arrest. Indeed, the arrest was wholly lawful. Enough said.
[7] That Jones' statement "I prefer not to speak on that" in fact really was an invocation of his right to terminate the interrogation as to that particular subject area is apparent (a) from the transcript of the interrogation, (b) from statements of Officers Payne and Moffett immediately following the "I prefer not to speak on that" (and prior to the point where Jones asks that the tape recorder be turned off), and (c) from the subsequent testimony (at the suppression hearing) of both Jones and the officers involved.
[8] This opinion represents a faithful application of Miranda as it has been elaborated upon in Mosley, Fare, and Edwards, all of which are cited above. We neither expand nor contract the doctrine. We simply apply it as it is, not as we may wish it were. This is our solemn duty under the Supremacy Clause. U.S. Const., Art. VI, cl. 2. Bolton v. City of Greenville, 253 Miss. 656, 666, 178 So.2d 667, 672 (1965); Sanders v. State, 429 So.2d 245, 251 (Miss. 1983).
[1] It is urged that Keys v. State, 283 So.2d 919 (Miss. 1973) is controlling, however, in that case a review of the trial record reveals that Keys related an account of the crime which would, if believed by the jury, have exonerated him. It is also urged that Hughes v. State, 376 So.2d 1349 (Miss. 1979) is controlling. It is true that in Hughes we said "It should be noted that an accused by becoming a witness at trial does not ipso facto waive his previous objection to the introduction of an out-of-court custodial admission. If the out-of-court admission was erroneously admitted, that error would be compounded by placing undue influence upon the accused to testify, thereby eroding the voluntariness of his testimony," citing Keys v. State, 283 So.2d 919 (Miss. 1973) and Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968). (376 So.2d at 1351). However, that statement was obiter dictum in that it was not necessary to the decision and, therefore, not binding as precedent. We further stated that "Here, however, it does not appear that Hughes' out-of-court admission was erroneously admitted... ." We affirm the conviction of Hughes.